George Forman (Cal. Bar No. 047822)
Jeffrey R. Keohane (Cal. Bar No. 190201)
FORMAN & ASSOCIATES
4340 Redwood Highway, Suite E352
San Rafael, CA 94903
Phone: (415) 491-2310
Fax:    (415) 491-2313
E-Mail: george@gformanlaw.com
            jeff@gformanlaw.com

Attorneys for Plaintiffs: TIMBISHA SHOSHONE
TRIBE, JOSEPH KENNEDY, ANGELA BOLAND,
GRACE GOAD, ERICK MASON, HILLARY FRANK,
MADELINE ESTEVES, and PAULINE ESTEVES

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMBISHA SHOSHONE TRIBE, a federally recognized Indian Tribe, JOSEPH KENNEDY, as Chairman and an individual member of the Timbisha Shoshone Tribe, ANGELA BOLAND, as Vice Chair and an individual member of the Timbisha Shoshone Tribe, GRACE GOAD, as Secretary-Treasurer and an individual member of the Timbisha Shoshone Tribe, ERICK MASON and HILLARY FRANK, as Tribal Council Members and as individual members of the Timbisha Shoshone Tribe, MADELINE ESTEVES and PAULINE ESTEVES, individual members of the Timbisha Shoshone Tribe, | CASE NO. 2:11-CV-00995-MCE-DAD  **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**  Date:  Time:  Judge: Hon. Morrison C. England, Jr. |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS, DONALD LAVERDURE, Acting Assistant Secretary of the Interior for Indian Affairs, AMY DUTSCHKE, Pacific Regional Office Director of the Bureau of Indian Affairs, TROY BURDICK, Central California Agency Superintendent of the Bureau of Indian Affairs, MARGARET CORTEZ, purported Tribal Council Secretary/Treasurer, BILL EDDY, purported Tribal Vice Chair, EARL FRANK, purported Tribal Council Member, GEORGE GHOLSON, purported Tribal Chairman, and CLYDE NICHOLS, purported Tribal Council Member, | |
| Defendants. | |

**SECOND AMENDED COMPLAINT**

1.      This is a civil action brought by members of the Timbisha Shoshone Tribe including the lawfully elected Tribal Council ("Kennedy Faction") against the United States Department of the Interior and its Bureau of Indian Affairs ("DOI") seeking declaratory and injunctive relief from decisions and conduct that unlawfully overruled the decisions of the Tribe's ultimate governing authority, the General Council, inflated the membership of the Tribe in order to dilute the votes of duly enrolled Tribal members, and replaced the Tribal Council with an illegitimate tribal government ("Gholson Faction").  DOI's decisions and conduct were arbitrary and capricious; in excess of DOI's legal authority and not in compliance with procedures required by law, including DOI's own regulations, at 25 CFR Part 2; and violated Plaintiffs' rights to free speech, petition, and due process of law, in violation of the Administrative Procedure Act, 5 USC §§ 701-706, federal law, and the First and Fifth Amendments to the Constitution of the United States.

2.      The first DOI decision challenged in this action installed the Gholson Faction with a "temporary" recognition on the ground that the Kennedy Faction limited voting in a tribal election to members of Tribe, which the DOI viewed as improper.  The Gholson Faction, allied with and backed by casino developers and investors with no connection to the Tribe, gained control of the Tribe based solely on the DOI's decisions and improper intervention in tribal affairs – not as the result of any lawful tribal election.  The Timbisha Constitution has an explicit and clear mandate to apply and enforce the specific constitutional membership qualifications in elections.  The DOI – again, not the voters in a tribal election – chose the Gholson Faction over the Kennedy Faction, although, by DOI's own analysis, the Kennedy Faction was elected in the latest valid election, because, the DOI said in its opinion, the Gholson Faction got more votes in their invalid, qualifications-do-not-matter election than the Kennedy Faction got in their election that complied with the Timbisha Constitution.  This was an arbitrary and improper choice by DOI and an intervention in the Tribe's affairs. Obviously, the faction that allows large numbers of nonmembers to vote would likely get more votes, but that would not say anything significant about the relative support of the rival factions among the Tribe's members.  The DOI then recognized and approved an election conducted by the Gholson Faction as the "temporary" tribal government without any examination of voters' or candidates' qualifications or any procedure for challenging qualifications.  The DOI's decisions resulted in improper and

1   illegitimate voting and holding office by persons unqualified to do either under the Timbisha

2   Constitution.

3        3.      Plaintiffs' allegations herein include conduct and facts involving various members,

4   nonmembers, officers and factions of the Tribe, but only as they are relevant to the decisions and

5   actions of the DOI.  The Gholson Faction and the Tribe's current officers are included as defendants

6   because they have been held by the Court to be necessary parties.  Claims are made and relief is

7   sought in this civil action only against the DOI and only for conduct by the DOI as a federal

8   government agency.

9                                  **JURISDICTION**

10       4.      The Court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C. §

11  1331, in that Plaintiffs seek judicial review and reversal of the Echo Hawk Decisions ("EHD"), and

12  federal law – the APA, 25 CFR Part 2, and federal case law – is determinative of the issues involved.

13       5.      The Court has the authority to review the final decisions made by administrative

14  agencies of the United States pursuant to 5 U.S.C. §§ 701-705.  The EHD is two decisions of the

15  AS-IA, issued on March 1, 2011 ("EHD I") and July 29, 2011 ("EHD II").  EHD I and II are attached

16  hereto as Exhibits A and B, respectively.  DOI regulations provide that decisions by the AS-IA are

17  final agency actions for the purpose of judicial review:

18              Decisions made by the Assistant Secretary-Indian Affairs shall be final
                for the Department and effective immediately unless the Assistant
19              Secretary-Indian Affairs provides otherwise in the decision.

20  25 CFR § 2.6(c).  The EHD is therefore "final so as to constitute Departmental action subject to

21  judicial review under 5 U.S.C. 704."  *Id.* § 2.6(a).

22       6.      The Court has authority to issue declaratory relief pursuant to 28 U.S.C. § 2201, and

23  to issue preliminary and permanent injunctive relief pursuant to the Court's equitable powers and

24  FRCP 65, because Plaintiffs have no plain, speedy or adequate remedy at law.

25       7.      All Plaintiffs have standing as members of the Tribe who have suffered direct injuries

26  as a consequence of the EHD.  Plaintiffs, with the exception of Hillary Frank, were appellants in the

27  DOI administrative appeals and have been aggrieved by the AS-IA having issued the EHD in

28  violation of the APA, DOI's regulations and federal case law.  Plaintiffs have exhausted their

    administrative appeals, resulting in a final agency action by the AS-IA, the EHD.  The EHD has

1  caused them direct injuries and injuries traceable to the EHD that this Court may redress through a

2  declaration of the rights and other legal relations of the parties, an injunction against Defendants, and

3  remand to DOI for further proceedings.

4          8.       Plaintiffs Boland, Goad, Frank, Kennedy, and Mason have standing to bring this suit

5  as duly-elected members of the Tribal Council.

6                                             **VENUE**

7          9.       Pursuant to 28 U.S.C. § 1391(e), venue is proper in this District in that the federal

8  defendants maintain offices in the City of Sacramento, California, BIA Pacific Regional Director

9  Amy Dutschke ("Dutschke") and BIA Central California Agency Superintendent Troy Burdick

10  ("Burdick") reside in or near the City of Sacramento, California, within this District, and a

11  substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

12  Pursuant to Local Rule 120, intradistrict venue is proper in Sacramento, in that all Defendants

13  maintain offices in Sacramento, and records pertaining to the action are present in Sacramento.

14                                            **PARTIES**

15         10.      Plaintiff Joe Kennedy is listed on the Tribe's 1978 Base Roll as approved by the BIA

16  in 1982, and is a currently enrolled Tribal Member, and was most recently elected to the Death

17  Valley Tribal Council in the General Election held in November 2011.  He has served as the Tribe's

18  duly-elected Chairman since 2004.  He was the Chairman of the 2007 Death Valley Tribal Council

19  recognized by Troy Burdick in 2008.  He was the Chairman of the 2006 Death Valley Tribal Council

20  recognized by Dale Morris in 2009.  As Chairman, his name is often used to denote the Tribal

21  Councils on which he sits, but as Chairman he does not vote except to break tie votes of the Tribal

22  Council or General Council.  He was an appellant in the DOI administrative proceedings starting in

23  2008.  His family's adobe home was one of those destroyed by DOI in the 1940s when his father was

24  serving in the Second World War.

25         11.      Plaintiff Angie Boland is listed on the Tribe's 1978 Base Roll as approved by the BIA

26  in 1982, and is a currently enrolled Tribal Member.  She has served the Tribe in elected and

27  appointed capacities since the 1980s.  She was elected to the Tribal Council in the General Election

28  of 2008 and most recently in the General Election of 2010.  She has served as the Tribe's

duly-elected Vice Chair since 2009.  She was an appellant in the DOI administrative proceedings.

1  HUD froze tribal housing funding on the basis of DOI decisions, preventing the Tribal Housing

2  Department from rehabilitating the FEMA trailer on the Timbisha Reservation in Death Valley in

3  which Boland planned to live when she moved back to Death Valley where she works.

4       12.     Plaintiff Grace Goad is a Tribal Elder.  She helped prepare the Tribe's 1978 Base Roll

5  approved by the BIA in 1982.  Her name appears on the 1978 Base Roll and she is a currently

6  enrolled Tribal Member.  She has served in various elected and appointed official capacities since

7  the 1970s.  She was most recently elected to the Tribal Council in the General Election held in

8  November 2011, and has served as the Tribe's duly-elected Secretary-Treasurer since 2010.  She was

9  an appellant in the DOI administrative proceedings.  She lives on the Timbisha Reservation in Death

10 Valley, CA, and as a Tribal Elder, depends upon the medical care and air conditioning that were

11 available at the Tribal Offices and Community Center in Death Valley.  Both have been shut down as

12 a result of the EHD.  She is one of the last native speakers of the Timbisha Language.

13      13.     Plaintiff Erick Mason's name appears on the Tribe's 1978 Base Roll as approved by

14 the BIA in 1982, is a currently enrolled Tribal Member, and has served on the Tribal Council in the

15 early 2000s and was most recently elected to the Tribal Council in the General Election of 2011.  He

16 was an appellant in the DOI administrative proceedings.  He is a keeper of ancient Timbisha

17 Shoshone songs and dances and is charged with the organization of traditional gatherings and

18 celebrations, which are centered on Death Valley.

19      14.     Plaintiff Hillary Frank is the daughter of a member listed on the Tribe's 1978 Base

20 Roll as approved by the BIA in 1982, is a currently enrolled Tribal Member, and was elected to the

21 Tribal Council in the Tribe's General Election held in November 2010.

22      15.     Plaintiff Pauline Esteves is a Tribal Elder.  She helped prepare the Tribe's 1978 Base

23 Roll approved by the BIA in 1982.  Her name appears on the 1978 Base Roll and she is a currently

24 enrolled Tribal Member.  She has served as Chairperson and in other tribal elected and appointed

25 capacities since the 1970s, including serving as Chairperson when the Tribe obtained federal

26 recognition and when the Tribe obtained passage of the Timbisha Shoshone Homeland Act of 2000.

27 Most recently she served on the Tribal Council from 2007 through 2009.  She was an appellant in the

28 DOI administrative proceedings.  She lives on the Timbisha Reservation in Death Valley, CA, and as

a Tribal Elder, depends upon the medical care and air conditioning that were available at the Tribal

Offices and Community Center in Death Valley.  Both have been shut down as a result of the EHD.  She is one of the last native speakers of the Timbisha Language.  Echo Hawk falsely accused her of being a convicted felon in his decision dated March 1, 2011.

16.     Plaintiff Madeline Esteves is a Tribal Elder, and sister-in-law of Pauline Esteves.  She helped prepare the Tribe's 1978 Base Roll approved by the BIA in 1982.  Her name appears on the 1978 Base Roll and she is a currently enrolled Tribal Member.  She has served in various tribal elected capacities since the 1970s.  Most recently she served on the Tribal Council from 2006 through 2010 as Secretary-Treasurer.  She left the Tribal Council in 2010 due to an illness in her family.  She was an appellant in the DOI administrative proceedings.  She lives on the Timbisha Reservation in Death Valley, CA, and as a Tribal Elder, depends upon the medical care and air conditioning that were available at the Tribal Offices and Community Center in Death Valley.  Both have been shut down as a result of the EHD.  She is one of the last native speakers of the Timbisha Language.

17.     Plaintiff Timbisha Shoshone Tribe ("Tribe") is a sovereign Indian tribe recognized by the Department of the Interior under the name the Death Valley Timbi-Sha Shoshone Band of California.  The Tribe exercises governmental authority over the Timbisha Shoshone Reservation ("Reservation"), established by Congress in the Timbisha Shoshone Homeland Act of 2000.  The Tribe is governed by its General Council of all duly qualified Tribal members 16 and older, which has delegated certain authorities to an elected five-member Tribal Council.

18.     Defendant Department of the Interior is a Cabinet-level department of the federal government, responsible, among other things, for Indian Affairs which includes protecting tribal trust assets and tribal sovereignty, economic development, and general tribal welfare.  DOI is also responsible for implementation of the Timbisha Shoshone Homeland Act of 2000.  16 USC § 410aaa Note.  DOI does not have authority to make tribal election or enrollment decisions.

19.     Defendant Bureau of Indian Affairs is an agency of the Department of the Interior, responsible for, among other things, protecting tribal trust assets and tribal sovereignty, economic development, and general tribal welfare.  BIA does not have authority to make tribal election or enrollment decisions.

20.     Defendant Donald Laverdure is Acting Assistant Secretary for Indian Affairs, and is

1   sued in that capacity.  Laverdure exercises supervisory authority over the BIA, Dutschke and

2   Burdick.  He succeeds Larry Echo Hawk as the Assistant Secretary of the Interior for Indian Affairs,

3   who rendered the final decision of which Plaintiffs seek judicial review.

4          21.     Defendant Amy Dutschke is the Director of the BIA's Pacific Regional Office, and is

5   sued in that capacity.  Dutschke is the successor to former Regional Director Dale Morris, who

6   rendered the decision overruling Defendant Burdick's decision.  Acting beyond his legal authority,

7   Morris authorized an Inyo County Deputy Sheriff to assist an individual, George Gholson, who was

8   not elected by the Tribe but had been temporarily recognized by BIA, to remove tribal property,

9   including all electronic and paper files, from the Tribe's office in Death Valley to a location 160

10  miles from the Tribe's Reservation.  In her capacity as Regional Director, Dutschke carries out the

11  directives and policies of Echo Hawk and exercises supervisory authority over defendant Burdick.

12         22.     Defendant Troy Burdick is the Superintendent of the BIA's Central California

13  Agency, and is sued in that capacity.  Burdick rendered the initial decision to recognize the Tribe's

14  2007 General Election that was overruled by Dutschke's predecessor Dale Morris.  Acting beyond

15  his legal authority, Burdick authorized an Inyo County Deputy Sheriff to assist an individual, George

16  Gholson, who was not elected by the Tribe or recognized by BIA, to remove tribal property from the

17  Tribe's office in Death Valley to a location 160 miles from the Tribe's Reservation.

18         23.     Defendant Margaret Cortez is a member of the Tribe and claims to be a member of

19  the Tribal Council of the Timbisha Shoshone Tribe.  She claims to have been elected in an election

20  held pursuant to the decision of then-Assistant Secretary Echo Hawk, and therefore has not been

21  elected in accordance with the Timbisha Shoshone Constitution.

22         24.     Defendant Bill Eddy is a member of the Tribe and claims to be a member of the

23  Tribal Council of the Timbisha Shoshone Tribe.  He claims to have been elected in an election held

24  pursuant to the decision of then-Assistant Secretary Echo Hawk, and therefore has not been elected

25  in accordance with the Timbisha Shoshone Constitution.

26         25.     Defendant Earl Frank is a member of the Tribe and claims to be a member of the

27  Tribal Council of the Timbisha Shoshone Tribe.  He claims to have been elected in an election held

28  pursuant to the decision of then-Assistant Secretary Echo Hawk, and therefore has not been elected

in accordance with the Timbisha Shoshone Constitution.

26.     Defendant George Gholson is not a member of the Tribe but he claims to be a member of the Tribal Council of the Timbisha Shoshone Tribe.  He claims to have been elected in an election held pursuant to the decision of then-Assistant Secretary Echo Hawk, and therefore has not been elected in accordance with the Timbisha Shoshone Constitution.

27.     Defendant Clyde Nichols is a member of the Tribe and claims to be a member of the Tribal Council of the Timbisha Shoshone Tribe.  He claims to have been elected in an election held pursuant to the decision of then-Assistant Secretary Echo Hawk, and therefore has not been elected in accordance with the Timbisha Shoshone Constitution.

28.     Defendants Margaret Cortez, Bill Eddy, Earl Frank, George Gholson, and Clyde Nichols are joined pursuant to Rule 19 Fed R. Civ. P. because this court ruled they are persons who claim an interest in the subject of this action and they are so situated that disposing of this action in their absence could as a practical matter impair or impede their ability to protect that interest.

29.     No relief is sought against Defendants Margaret Cortez, Bill Eddy, Earl Frank, George Gholson, and Clyde Nichols.

30.     Defendants Margaret Cortez, Bill Eddy, Earl Frank, George Gholson, and Clyde Nichols have no genuine legal interest in the subject matter of this action.

31.     Defendants Margaret Cortez, Bill Eddy, Earl Frank, George Gholson, and Clyde Nichols, do not enjoy sovereign immunity from suit because they are not legitimately elected Tribal Council members and because no relief is sought against them, much less money damages that might be satisfied from Tribal funds.

32.     Defendants Margaret Cortez, Bill Eddy, Earl Frank, George Gholson, and Clyde Nichols, are not lawfully elected members of the Tribal Council, because, among other reasons, they were elected as the result of an election not authorized by the Timbisha Shoshone Constitution but improperly ordered by the Assistant Secretary and in which many persons were allowed to vote and run who do not meet the membership requirements of the Constitution.

**ALL PERSONS REQUIRED TO BE JOINED IF FEASIBLE
ARE JOINED IN THIS MATTER**

33.     Pursuant to FRCP 19(c), Plaintiffs are required to list "the name, if known, of any person who is required to be joined if feasible but is not joined *** and the reasons for not joining

1  that person."  The only relief that Plaintiffs request in this Second Amended Complaint is that the

2  Court remand the EHD to DOI for further proceedings in compliance with the APA, federal

3  regulations, and federal law.  The Court "can[] accord complete relief among existing parties"

4  because the only relief sought in this Complaint is relief against DOI and its employees.

5        34.  Because of the unlawful actions of the Assistant Secretary and the unlawful elections

6  held in violation of the Timbisha Shoshone Constitution, the Timbisha Shoshone Tribe's lawfully

7  elected tribal government is not federally recognized at this time, and the federally recognized

8  supposed tribal government is not lawfully elected.  General Council of the Tribe cannot waive

9  sovereign immunity because the challenged decision by DOI have added 80 nonmembers to it.

10  Therefore, there is no governing body of the Tribe that can competently assert or waive its sovereign

11  immunity or otherwise respond to this action.  Moreover, the contending factions that claim to be the

12  legitimate officers of the Tribe's government are both parties to this action, which satisfies Rule 19.

13        35.  The Tribe's interests, so far as it is represented by the purported tribal government

14  recognized by the Echo Hawk Decision, is substantially the same if not identical to the interest of the

15  individuals who claim to be members of the Tribal Council and who are made defendants to this

16  action. The Tribe's interest is also represented by the members of the lawfully elected Tribal

17  Council, included amongst the Plaintiffs in this action.  The parties to this action now include all

18  individual officers from both factions. Therefore, the Tribe's interests will be fully before the court

19  and will not be prejudiced by any disposition of this action.

20        36.  The Tribe is identified as a Plaintiff in this Complaint because its only cognizable

21  interest in this case is to ensure that the decision making process of DOI comply with applicable

22  federal law. The outcome of the case will not affect any legally protected interest of the Tribe,

23  however.  At issue in this case is whether the Department of the Interior violated the Constitution of

24  the United States , the Administrative Procedure Act, and other federal laws in its decision making

25  procedures. If Plaintiffs are successful, this Court will require DOI to reconsider the decisions

26  rendered by former AS-IA Larry Echo Hawk on March 1, 2011, and July 29, 2011. The General

27  Council of the Tribe will remain the ultimate governing authority of the Tribe's territory and its

28  members in any event.  This Complaint does not seek to terminate DOI's recognition of the Gholson

Faction as the Tribal Council for the purposes of government-to-government relations or to transfer

1   that recognition to the Death Valley Tribal Council led by Joe Kennedy, and such an order is likely

2   beyond the power of this Court to grant.

3   37.   In the alternative, the Tribe is joined pursuant to Rule 19 Fed R. Civ. P. because this Court in

4   dismissing the First Amended Complaint ruled it had a claimed interest in the subject of the action

5   and disposing of this action in its absence could as a practical matter impair or impede its ability to

6   protect that interest. Under federal case law, the Court may realign the parties if it finds that their

7   interests are not properly reflected by their designation as plaintiffs or defendants.

8   **FACTUAL AVERMENTS COMMON TO ALL CLAIMS FOR RELIEF**

9   **HISTORY OF THE TRIBE**

10   38.   The Timbisha were one of six Western Shoshone bands in an area spanning the

11   California-Nevada border at the time of first contact with non-Indians.  The Timbishas were the only

12   Shoshones in Death Valley, and did not range far from the mountains above it.  Although some were

13   forced to leave to find work or housing, Timbishas held onto their village in Death Valley despite

14   efforts by DOI to force them to leave after Death Valley was proclaimed a National Monument.

15   39.   In the 1960s and 1970s, a group of Timbishas in and out of the tribal government,

16   including elders and Plaintiffs Madeline Esteves, Pauline Esteves, and Grace Goad, began a

17   campaign for their rights.  The Tribe assembled an application for federal re-recognition and

18   submitted it in 1979.

19   40.   As part of the application for federal recognition, the Tribe compiled a base roll of

20   Timbishas with at least one-quarter Indian blood ("1978 Base Roll").

21   41.   In 1982, DOI decided to acknowledge the Timbishas as an Indian tribe.  In its

22   decision, DOI found that the Tribe was the successor to a single autonomous Indian entity composed

23   of Timbishas living in Death Valley since time immemorial, and to the entity with which DOI dealt

24   in the 1930s through the three-member Tribal Council representing the Timbisha Village in Death

25   Valley.  It found that all known Timbishas were on the 1978 Base Roll, and that they all descended

26   from about 10 families known from the historic record as having lived within Death Valley.

27   42.   DOI's federal acknowledgment regulations provide that:

28   Upon acknowledgment as an Indian tribe, the list of members
submitted as part of the petitioners documented petition shall be the
tribe's complete base roll for purposes of Federal funding and other

1
2
3
4

    administrative purposes. For Bureau purposes, any additions made to the roll, other than individuals who are descendants of those on the roll and who meet the tribe's membership criteria, shall be limited to those meeting the requirements of Sec. 83.7(e) and maintaining significant social and political ties with the tribe (i.e., maintaining the same relationship with the tribe as those on the list submitted with the group's documented petition).

5   25 CFR 83.12.

6       43.    Despite federal re-recognition, the Tribe did not have a recognized land base. The

7 Timbishas were treated as squatters in their Death Valley homeland and were prevented by DOI from

8 carrying out traditional cultural practices within Death Valley.

9       44.    The Timbishas, led by Plaintiff Pauline Esteves and other Tribal Elders, eventually

10 negotiated an agreement that was implemented by Congress in the Timbisha Shoshone Homeland

11 Act of 2000 ("Homeland Act"). Pub. L. 106-423, 114 Stat. 1875 (16 USC 410aaa Note). The

12 Homeland Act reserved over 7,000 acres of land in trust for the Tribe in and around the Park,

13 including over 300 acres around the Timbisha Village.

14       45.    The activities of casino or gaming developers have played a major role in the efforts

15 to gain control of the Timbisha Shoshone government and to persuade DOI, alternately at various

16 times, to recognize or not recognize the Timbisha Shoshone Tribal Government. Generally, DOI has

17 chosen to recognize the faction supported by gaming developers.

18                                    **TRIBAL CONSTITUTION AND LAW**

19       46.    The Tribe adopted a written Constitution in 1986. The Constitution establishes the

20 General Council – all members 16 and older – as the supreme authority of the Tribe. The

21 Constitution also establishes a five-member Tribal Council with limited delegated authority. The

22 Tribal Council is composed of a Chairman, Vice Chair, Secretary-Treasurer, and two Council

23 Members. The Chairman generally represents the Tribe in external affairs, presides over meetings of

24 the Tribal and General Councils, and may convene General Council meetings, but may only vote if

25 there is a tie vote in the Tribal or General Councils. The Tribal Constitution reserves to the General

26 Council the right to continue to exercise those powers the Constitution delegates to the inferior

27 branches of government, and the right to exclusive exercise of all powers not expressly delegated,

28 including the judicial power until the Tribe creates a judiciary. After creation of the judiciary, the

General Council will continue to serve as the Tribe's highest court of last resort.

47.     The General Council of the Tribe is made up of approximately 220 lawful, voting members of the Tribe.  For DOI's purposes, the General Council of the Tribe, in compliance with, and only because of the challenged Echo Hawk decisions, now includes approximately 80 additional persons who do not appear on the 1978 Base Roll of the Tribe, have never supplied proof of eligibility for tribal membership, and are not and do not qualify to be members of the Tribe.

48.     The Constitution carries forward the membership criteria approved by DOI in 1982, defining membership in the Tribe as those on the 1978 Base Roll used to obtain recognition from DOI and their lineal descendants. Any other person must not only have Timbisha blood but be approved by the full General Council. The Tribal Enrollment Committee must annually review the Membership List on August 31 to make any additions or deletions to the list.  The Tribe's Constitution and Enrollment Ordinance require the Tribal Enrollment Committee to remove any person enrolled erroneously, fraudulently, or otherwise incorrectly from the membership list.  The Enrollment Ordinance provides for an appeal procedure, including a hearing, and does not prevent disenrollees from reapplying at any time.

49.     The Constitution requires that the General Election take place on the second Tuesday of November annually.  In preparation for each General Election, the Tribal Election Board must consult with the Tribal Enrollment Committee to develop the list of registered voters.  It adds newly eligible members and deletes those found ineligible or deceased.  Because members of the Tribal Election Board may only be removed for specific, non-political reasons, the Board generally remains unchanged year-to-year.  The Tribal Election Board administers all Special, General, Recall, Referenda Elections, and voting at General Council meetings, counts the votes, and announces the preliminary results.  Any tribal member may appeal the outcome of a vote under the Election Ordinance.  The Tribal Election Board may order a new election or reject the appeal.  If there is no appeal, or if the appeal is rejected, the Tribal Election Board certifies the outcome of the election to the Tribal Council.  The Tribal Election Board informs, but does not seek approval of, the BIA.

50.     The Constitution does not authorize DOI to intervene in tribal elections or tribal membership matters: "[t]he General and Tribal Councils shall submit Tribal laws and enactments to the Secretary of the Interior for his review, comment and approval *only when required to do so by federal law*."  Timbisha Constitution, Art. IX, § 4 (italics added).

**BACKGROUND TO THE DOI DECISIONS CHALLENGED IN THIS ACTION**

51.     In or about 2003, when the question of their eligibility for membership in the Tribe was raised, some of Gholson's relatives, led by Shirley Summers and Leroy Jackson, removed the membership and other files from the Tribal Office in Death Valley and took them to an office rented in the name of another relative, Virginia Beck, in Bishop, CA.  By that tactic, they were able to forestall their disenrollment until 2008 when the enrollment files were finally returned to the Tribal Administration Building in Death Valley.

52.     In 2004, two gaming developers that wanted to take advantage of Section 5 of the Homeland Act to build a Timbisha-owned casino in Hesperia, funded competing tribal factions seeking to take control of the tribal government.  DOI's erratic, inconsistent, and frequently unlawful responses to these factions perpetuated the dispute.

53.     As it did in the current dispute, DOI acted pursuant to its rule that whenever any person appeals DOI's recognition of a tribal election, the Department will return to recognizing the last tribal government whose recognition by DOI was not appealed ("Rollback Rule").  The Rollback Rule, necessarily resulted in interim recognition of groups that no longer existed.  A group of tribal members ("Boland Faction") sought review from this Court under the APA.  Unlike Plaintiffs in this action, the Boland Faction also sought recognition as the validly elected tribal government by this Court and injunctive relief directly against the members of the faction led DOI had recognized on an interim basis. *Timbisha Shoshone Tribe v. Bureau of Indian Affairs*, 2003 WL 25897083.  Also unlike Plaintiffs in this action, the Boland Faction did not exhaust its administrative remedies.

54.     The General Council met in 2004 and passed resolutions settling the dispute and establishing the lawfulness of the Death Valley Tribal Council.  Because DOI did not interfere with the resolution reached by the Tribe's General Council and recognized the General Election held in 2004 instead of rolling back to an earlier, expired Tribal Council, a period of relative stability began that finally ended on February 24, 2010 when Defendant Burdick summarily terminated government-to-government relations with the Tribe.

///

///

### DOI'S ARBITRARY AND INCONSISTENT DECISIONS CONCERNING THE TRIBAL ELECTIONS OF 2006, 2007, 2008, 2009, AND 2010

55.     On November 14, 2006, the Tribal Election Board administered the annual General Election.  It immediately announced the results of the election to the General Council.  The Tribal Election Board received no appeals of the 2006 General Election.  Soon thereafter, the Tribal Election Board certified the election of Edward Beaman and Madeline Esteves to two-year terms.  Together with the members of the Tribal Council whose terms would end in 2007 – Chairman Joe Kennedy (elected 2005) and Council Members Virginia Beck (elected 2005) and Cleveland Casey (appointed) – they formed the 2006 Tribal Council.

56.     In or about July 2007, claims were brought by siblings Margaret Cortez and Wallace Eddy against Beaman and Beck for mismanagement of funds provided to Beaman by a gaming developer and for other official misconduct.  A hearing on the charges was scheduled for the regularly scheduled Tribal Council meeting on August 25, 2007.  A quorum was established.  Under Robert's Rules of Procedure, which govern Tribal Council meetings, a quorum continues until someone calls attention to the lack of a quorum.  Beaman and Beck left after a disagreement about voting on their removal.  Casey left shortly thereafter.  Kennedy called a recess.  After the recess, Casey, Madeline Esteves, and Kennedy returned and the meeting resumed.  The charges were discussed by the three Tribal Council members and the audience.  Casey left the meeting at some point, stating that he would be "right back."  The remaining members of the Tribal Council found Beaman and Beck's seats vacant.  Pursuant to the Tribal Constitution, Beck's seat was filled by appointment of Margaret Armitage because her term had less than 12 months remaining in it, while Beaman's seat was left to be filled at the next election because his term had more than 12 months remaining in it.

57.     After August 25, 2007, the Beaman Faction stopped attending the regularly scheduled Tribal Council meetings.  The Beaman Faction signed various purported resolutions that, if they had ever been given effect, would have given the three of them control of the tribal government and its funds.  They were supported in their efforts by the Tribe's former gaming partner, Merrion, and the Tribe's former law firm, Fredericks Peebles & Morgan.  At no point did any governmental entity work with the Beaman Faction.

58.     Death Valley Tribal Council, headed by Plaintiff Kennedy, continued to govern the Reservation and seek out economic development opportunities to replace the casino development proposed by Merrion, which had sided with the Beaman Faction.  The Death Valley Tribal Council oversaw the Housing Department, Environmental Department, Tribal Historic Preservation Office, and provided education, health, and other tribal member assistance, as well as distributing the RSTF to members on a per capita basis.  All of the Death Valley Tribal Council's funds came from grants and contracts with federal and state agencies, which continued to recognize it as the tribal government.

59.     In September 2007, the Tribal Election Board, in consultation with the Tribal Enrollment Committee, produced the new list of registered voters ("2007 Voters List") by adding newly eligible voters to, and deleting disqualified and deceased voters from, the previous election's Voters List. The Board distributed ballots based on the 2007 Voters List.

60.     The Tribal Election Board conducted a regular annual general election on November 13, 2007, and announced the results to the General Council immediately.  No one appealed the election results to the Tribal Election Board, and on December 4, 2007, the Board certified the election of Joe Kennedy, Margaret Armitage, Pauline Esteves, and Margaret Cortez to join Madeline Esteves on the Council ("2007 Death Valley Tribal Council").  Casey ran as a candidate on the Tribal Election Board's official ballot, but lost his bid for reelection.

61.     Using funds supplied by the Tribe's former gaming developer, Merrion, the Beaman Faction held its own election, which it styled "Election Mark II."  The Beaman Faction sought the recognition of its election from Defendant Burdick.  On December 14, 2007, Defendant Burdick, based on his interpretation of tribal law, declined to recognize either election.

62.     On December 19, 2007, Chairman Kennedy called for a special meeting of the General Council pursuant to the Tribal Constitution to discuss gaming issues and the leadership conflict.  On or about January 14, 2008, Kennedy mailed the agenda and resolutions to be considered at the Special General Council meeting to the General Council members.

63.     On January 20, 2008, the General Council convened, the Tribal Election Board confirmed that a quorum existed, and the General Council proceeded to adopt four resolutions by wide margins, using secret ballots.  The Beaman Faction took a vociferous part in the meeting, but

1    the General Council, as it had done in 2004, resolved the conflict by recognizing the 2007 Death

2    Valley Tribal Council that it had elected in November 2007 as the legitimate Tribal Council.  The

3    General Council defined the undefined term "resign" in the Tribal Constitution in a manner that

4    supported the Tribal Council's interpretation that Beaman and Beck had resigned.  Among other

5    things, the General Council nullified all purported actions by the Beaman Faction, such as its

6    takeover of tribal funds, and fired the Tribe's former law firm, which had backed the Beaman

7    Faction, and hired a new one.  The General Council also made the fateful decision to authorize

8    negotiations with a gaming developer called GIE.

9         64.    In response, on February 29, 2008, Defendant Burdick recognized the Tribal Election

10   Board-administered General Election of 2007 that resulted in the 2007 Death Valley Tribal Council.

11   On March 17, 2009, the Beaman Faction filed the Beaman Appeal with Regional Director Morris

12   seeking recognition of the Beaman Faction's 2007 election.

13        65.    Notwithstanding the Beaman Appeal, the Death Valley Tribal Council continued to

14   function normally and DOI continued to work with it on a government-to-government basis.

15                **GAMING DEVELOPER-FUNDED EFFORT TO GAIN DOI RECOGNITION**

16        66.    On June 25, 2008, the Tribal Council was evenly divided on whether to terminate the

17   relationship with GIE.  Chairman Kennedy cast the deciding vote in favor of termination.  The letter

18   terminating the relationship with GIE cited the firm's complete lack of experience and attempts to

19   illegally influence the votes of Tribal and General Council members.

20        67.    GIE, which had been occasionally funding Gholson and other supporters, immediately

21   began funding a campaign for the recall of Joe Kennedy.  The campaign failed, and Gholson

22   attempted to petition the Death Valley Tribal Council to call a meeting of the General Council. When

23   that failed, Gholson announced a meeting unilaterally.  GIE paid for the meeting, paid for lodging

24   and transportation for attendees, and paid individuals to vote, including underage and non-Timbisha

25   voters.  Gholson proclaimed himself the Chairman and Wallace Eddy as Vice Chair, and entered into

26   the agreement with GIE that the Death Valley Tribal Council had rejected on June 25, 2008.

27        68.    On October 17, 2008, Burdick recognized Gholson as Chairman and Wallace Eddy as

28   Vice Chair based solely on the word of Gholson, and without seeking the views of the members of

     the Death Valley Tribal Council, which Burdick still recognized.  DOI's regulations, 25 CFR § 2.6,

1    provide that the decision could not take effect for 30 days.  During this 30-day period, the Death

2    Valley Tribal Council appealed the decision, suspending the decision indefinitely.

3            69.     Despite the fact that his decision to recognize Gholson was ineffective, on October

4    20, 2008, Burdick unlawfully encouraged an Inyo County Deputy Sheriff to assist Gholson in

5    removing the Tribe's records and other property from the Tribe' offices over the objections of the

6    still recognized Death Valley Tribal Council members.  Based on what Burdick told him, the Deputy

7    threatened to arrest anyone, including Elders, who interfered with Gholson's removal of, among

8    other things, the Tribe's financial and administrative computers, containing all of the Tribe's

9    financial, membership, and other confidential data, from the Tribal Administration Building on the

10   Reservation to the private office rented for him by GIE over three hours away in Bishop, CA.

11           70.     In a letter dated October 20, 2008, Burdick admitted that his October 17, 2008

12   decision, like all BIA decisions, could not take effect for at least 30 days after it was issued.  The

13   letter confirmed that he continued to recognize the Death Valley Tribal Council (Kennedy, Armitage,

14   Madeline Esteves, Pauline Esteves, and Cortez).

15           71.     On November 10, 2008, Burdick issued a letter that proposed to shift recognition to

16   the 2006 Death Valley Tribal Council (Kennedy, Beaman, Madeline Esteves, Beck, and Casey),

17   despite the fact that three seats on that Council had expired in 2007 and the other two would expire

18   in matter of days. The letter was timed to interfere with the General Election on November 11, 2008.

19                          **THE 2008 UNCONTESTED TRIBAL COUNCIL ELECTION**

20           72.     On September 25, 2008, the Tribal Enrollment Committee found that 74 individuals

21   on the Membership list, but not the Base Roll, had never supplied proof of eligibility for tribal

22   membership. They were removed from the list of members as required by the Tribal Constitution and

23   Enrollment Ordinance pursuant to the membership criteria approved by DOI in 1982.

24           73.     The disenrollees included both supporters and opponents of the Death Valley Tribal

25   Council, such as Gholson and Leroy Jackson, who were later temporarily recognized by Echo Hawk

26   to carry out an election on his behalf.  Both Gholson and Jackson were born well before 1978, and

27   therefore would have appeared on the 1978 Base Roll if they were members pursuant to DOI's 1982

28   finding that all known Timbishas were included on the Base Roll. Gholson, Jackson, and the others

     received notices by certified mail of the Tribal Enrollment Committee's decision and their right to

1  appeal but did not respond or appeal.

2  74.  In October 2008, the Tribal Election Board consulted with the Tribal Enrollment

3  Committee to develop the 2008 Voters List, as it did every year, by adding newly of-age voters to,

4  and deleting disqualified and deceased voters from, the 2007 Voters List.  Thus the 74 disenrollees

5  were removed from the list of members in September 2008 and from the list of registered voters in

6  October 2008.  In January, after a delay caused by the removal of the contents of the Tribal Office,

7  and long after the time for appeal had expired, the Death Valley Tribal Council performed the

8  ministerial act required by the Tribal Constitution and Enrollment Ordinance of adopting resolutions

9  accepting the Tribal Enrollment Committee's decisions.

10  75.  The Tribal Election Board distributed ballots for the General Election based on the

11  2008 Voters List, and on November 11, 2008, the Tribal Election Board conducted the annual

12  General Election and announced the results to the General Council. No one appealed the results to

13  the Election Board and on November 20, 2008.  The Election Board certified to the Tribal Council

14  that the General Council had reelected Madeline Esteves and elected Angie Boland. The Election

15  Board informed the General Council and the BIA.  The 2008 Tribal Council thus consisted of

16  Chairman Joe Kennedy, Vice Chair Pauline Esteves, Secretary-Treasurer Madeline Esteves, and

17  Council Members Angie Boland and Margaret Cortez ("2008 Death Valley Tribal Council").

18  76.  Despite the fact that both pretended to be the Tribal Council, neither the Gholson nor Beaman

19  Faction held an election or appealed the Tribal Election Board's election.

20  77.  DOI was informed of the outcome and the Death Valley Tribal Council requested that

21  DOI find the Beaman Appeal to the Pacific Region of BIA moot pursuant to DOI decisional law.

22  **BIA PACIFIC REGION RECOGNITION DECISIONS**

23  78.  On December 4, 2008, then-Pacific Regional Director Dale Morris issued a decision

24  recognizing Gholson as Chairman and Wallace Eddy as Vice Chair effective immediately under 25

25  CFR § 2.6.  The decision was based on a letter and other *ex parte* communications from the Gholson

26  and Beaman Factions' attorney.  The communications falsely asserted that the Death Valley Tribal

27  Council would miss an important filing deadline on December 22, 2008 in the proceedings before

28  the Atomic Safety Licensing Board concerning the license application for the High Level Nuclear

Waste Repository at Yucca Mountain, NV.  The proceedings are of great importance to the Timbisha

1   because Yucca Mountain is just across the Nevada Border from Death Valley.  Morris did not

2   consult with the DOI-recognized Death Valley Tribal Council, inform it of the communications, and

3   refused to provide a copy of the letter until more than a month later. As a result of Morris's decision,

4   both the Death Valley Tribal Council and the Gholson Faction made appearances with the Atomic

5   Safety Licensing Board, the Department of Energy opposed the participation of either.

6           79.     On December 12, 2008, Gholson again arrived unannounced at the Tribal

7   Administration Building in Death Valley.  He brought a moving truck, an Inyo County Deputy

8   Sheriff, and a locksmith.  Morris, knowing that the tribal chairmen cannot act in opposition to their

9   own Tribal Councils, encouraged the Deputy Sheriff to assist Gholson to do what he wanted,

10  notwithstanding the protests of three of the four Tribal Council Members present. The Deputy again

11  threatened to arrest anyone who interfered with Gholson. His locksmith drilled out the locks

12  protecting confidential Tribal files, and, over the objections of three Tribal Council members, Tribal

13  Elders and staff, Gholson took all of the Tribe's office equipment and confidential Indian Child

14  Welfare Act, personnel, membership, and financial files from the Death Valley Reservation to the

15  office rented for him by GIE three hours away in Bishop, CA.

16          77.     The Death Valley Tribal Council filed suit to overturn the December 4, 2008 decision,

17  and on December 22, 2008, Morris rescinded the decision recognizing Gholson.  Despite the

18  supposedly exigent circumstances, the Gholson Faction did not submit its filing with the Atomic

19  Safety Licensing Board until hours after Morris's December 22, 2008 rescission.

20          80.     The Tribe requested that Burdick and Morris assist in retrieving tribal property from

21  Gholson, but they refused to provide the same assistance to the Death Valley Tribal Council that they

22  had provided to Gholson.  As a direct and proximate result of Burdick's and Morris's decisions, and

23  their refusal to assist the Death Valley Tribal Council, the Tribe was unable to fulfill its obligations

24  to the U.S. Internal Revenue Service, the U.S. EPA and DOI, causing the Tribe to incur financial

25  penalties and loss of grants and contracts under which the Tribe's government had been providing

26  services to the Tribe's members living in Death Valley and elsewhere.  Notwithstanding the removal

27  of important files and equipment, however, the Death Valley Tribal Council continued to govern the

28  Reservation and pursue economic development opportunities.

            81.     On February 17, 2009, Director Morris reversed Superintendent Burdick's decision

1  recognizing the 2007 Death Valley Tribal Council.  On March 24, 2009 Morris reversed

2  Superintendent Burdick's October 17, 2008 decision recognizing Gholson.  In both decisions, Morris

3  proposed to recognize the 2006 Tribal Council.  Morris did not acknowledge that the last terms of

4  office of the 2006 Tribal Council had expired in December 11, 2008 at the latest, or that an entirely

5  new Council had been elected in the General Elections of 2007 and 2008.

6       82.    Plaintiffs are informed, believe, and on that basis allege, that Morris made his

7  decision to recognize the expired 2006 Tribal Council on the basis that he disagreed with the actions

8  of the Tribal Enrollment Committee in removing 74 individuals from the Membership list in

9  September 2008, and communicated the basis of his decision to the Beaman and Gholson Factions *ex

10 parte* in advance of issuing the decisions.

11      83.    The Death Valley Tribal Council appealed Morris's February 17 decision, and the

12 Gholson Faction appealed his March 24 decision, to the Interior Board of Indian Appeals ("IBIA"),

13 thereby suspending the effect of both decisions.

14      84.    The Acting AS-IA, George Skibine, then took jurisdiction over both appeals.  On June

15 22, 2009, Echo Hawk, the recently appointed AS-IA, consolidated the appeals, set a briefing schedule,

16 and provided an index of the record on appeal along with what purported to be the record.  The pages

17 of the documents in the record were interleaved making it nearly impossible to discern which

18 documents were actually provided making it nearly useless for appellants.  Eventually, DOI agreed to

19 provide a useable copy of the record.  In litigation before this Court, however, DOI has represented

20 that Echo Hawk's long delay in rendering a decision was due to the request by appellants for more

21 time to review his administrative record.

22      85.    DOI and other federal agencies continued to work with the Death Valley Tribal

23 Council on a government-to-government basis throughout 2009.  DOI and the other agencies,

24 including DOI's National Park Service, HUD, and EPA, made grants to and entered into cooperative

25 agreements with the Death Valley Tribal Council that are only available to recognized Indian tribal

26 governments and consulted with the Death Valley Tribal Council on a government-to-government

27 basis on federal actions.  The only conflict, apart from the continuing administrative appeals of the

28 automatically suspended DOI decisions, was over the annual PL 93-638 contract with BIA to provide

tribal governmental services, which was declined in July 2009.  Although the Death Valley Tribal

1   Council appealed the denial, DOI never acted on the appeal despite statutory deadlines to do so.

2      86.      In September 2009, the Tribal Enrollment Committee conducted its annual review of

3   the tribal Membership list and consulted with the Tribal Election Board as it prepared the 2009 Voters

4   List, adding newly of-age voters to, and deleting disqualified and deceased voters from, the 2008

5   Voters List.  On November 10, 2009, the Tribal Election Board conducted the annual General

6   Election for three open Tribal Council seats.

7      87.      The BIA sent two representatives to Death Valley to observe the Tribal Election

8   Board's administration of the General Election and reported no problems with the election.

9      88.      The Tribal Election Board informed the General Council of the results, and received

10  no appeals.  On November 17, 2009, the Tribal Election Board certified that the General Council had

11  elected Joe Kennedy, Erick Mason, and Grace Goad.  The Election Board announced the results to the

12  General Council and the BIA.  The 2009 Tribal Council thus consisted of Chairman Joe Kennedy,

13  Vice Chair Angie Boland, Secretary-Treasurer Madeline Esteves, and Council Members Grace Goad

14  and Erick Mason ("2009 Death Valley Tribal Council").

15     89.      On November 10, 2009, in Bishop, 160 miles from the Reservation, the Gholson

16  Faction conducted a purported election in which it claimed to have elected five council members

17  despite the fact that in even-numbered years only two seats are open.

18     90.      On February 19, 2010, Defendant Echo Hawk issued a Scheduling Order in the appeal

19  then-styled *Joe Kennedy, Pauline Esteves, Madeline Esteves, Angie Boland, and Erick Mason,*

20  *Plaintiffs/Appellants, and George Gholson, Wallace Eddy, and Margaret Cortez,*

21  *Plaintiffs/Appellants, v. Pacific Regional Director, Bureau of Indian Affairs*.  Echo Hawk committed

22  to issuing a decision within 60 days after the last brief filed as required by 25 CFR Part 2.

23     91.      Also on February 19, 2010, DOI finally provided the record for the administrative

24  appeals on CD-ROM ("Record").  The most recent document in the Beaman record is dated April 7,

25  2009; the most recent in the Gholson record is dated May 22, 2009.  The DOI also assembled a list of

26  documents not in either record, the last of which is dated October 5, 2009.

27     92.      The Scheduling Order declared that DOI would not recognize the September 2008

28  disenrollments, encouraged the Tribe to hold a Special Election in which the disenrollees would have

    the opportunity to vote, and indicated that Echo Hawk would not recognize the Beaman Faction or the

2007 Death Valley Tribal Council.  The Scheduling Order contained no reasoning in support of its orders that the disenrollees were Tribal members and must be permitted to vote.

93.     On February 23, 2010, the Gholson Faction withdrew its appeal.  On March 19, 2010, in its appellate brief the Death Valley Tribal Council noted the withdrawal of the Gholson Appeal and requested an opportunity to brief issues in that appeal if it proceeded.  DOI did not respond to the request.  Based on Gholson's withdrawal, the 2009 Death Valley Tribal Council's brief did not address the reasons why the AS-IA should not recognize the Gholson Faction.

**THE FEBRUARY 24, 2010 DECISION BY DEFENDANT BURDICK TO CREATE A HIATUS IN GOVERNMENT-TO-GOVERNMENT RELATIONS BETWEEN THE FEDERAL GOVERNMENT AND THE TRIBAL GOVERNMENT ("BURDICK III")**

94.     In mid-February, Chairman Kennedy requested that Defendant Burdick issue a letter recognizing that he was the last recognized Timbisha Chairman consistent with his and Morris's previous decisions so that he could persuade one of the Tribe's banks to unfreeze a tribal account to prevent the checks written to tribal members from bouncing.  On February 24, 2010, Burdick issued a decision ("Burdick III") terminating government-to-government relations with the Tribe.

95.     Burdick informed Plaintiff Kennedy that Burdick III was written by Jim Porter, the lawyer in the Office of the Solicitor responsible for the administrative appeals then before Echo Hawk, and the principal author of the Scheduling Order.  Burdick did not make the decision effective immediately, therefore Burdick III could not take effect for 30 days. The Death Valley Tribal Council timely appealed Burdick III to the Acting Director of the Pacific Regional Office, Dale Risling. Under 25 CFR Part 2, the appeal automatically suspended the effect of Burdick III until resolution of the appeal.  DOI has not acted on the appeal.

96.     The Tribe's federal funding agencies and the California Gambling Control Commission ("CGCC") all received copies of Burdick III.  The CGCC distributes the Revenue Sharing Trust Fund ("RSTF") to California Indian tribes with less than 350 slot machines.  The Tribe has no slot machines.  The federal and state agencies that received copies of Burdick III consulted with DOI concerning the decision, and were informed by DOI employees, including lawyers in the DOI Office of the Solicitor, that Burdick III was in effect, notwithstanding the requirements of 25 CFR Part 2.  DOI also informed federal agencies required to consult with the Tribe under the National Historic Preservation Act and the National Environmental Policy Act were informed that they were no

1    longer required to consult with the Tribe because it lacked a tribal government.

2        97.    During 2010, as a result of DOI's misrepresentation of the legal effect of Burdick III,

3    federal and state funding to the Tribe was terminated leading to the shut down of the Tribe's

4    Departments.  In March, HUD froze funding to the Housing Department, terminating mortgage and

5    rental assistance to members on- and off-Reservation and work to make donated FEMA trailers on the

6    Reservation habitable.  In April 2010, CGCC began retaining the RSTF in trust for the Tribe pending

7    a decision by DOI.  In December 2010, EPA froze funding and the Tribal Environmental Department

8    laid off its staff just weeks after EPA had commended them for their outstanding work.  The basis

9    cited for all the decisions by the federal agencies and CGCC was the legally ineffective Burdick III.

10       98.    Despite the closure of the Tribal Departments, the Death Valley Tribal Council

11   continued to govern the Reservation and provide non-monetary assistance to tribal members.

12       99.    From March through September 2010, the 2009 Death Valley Tribal Council worked

13   with BIA to plan a Special Election to be supervised by the Tribe and BIA on the date of the next

14   General Election – the only time that an entire five-member Tribal Council can be elected, which was

15   what happened in the successful resolution of the previous crisis through the 2004 General Election.

16       100.   On June 18, 2010, Acting Principle Deputy Assistant Secretary of the Interior for

17   Indian Affairs, George Skibine, sent a letter to the Death Valley Tribal Council informing it that strict

18   compliance with tribal law would not be possible in the planned Special Election.  He promised,

19   however, that DOI would "ensure not only that each candidate is on the Tribe's membership roll, but

20   that each candidate meets the requirements for enrollment."

21       101.   Under pressure from DOI, the Tribal Election Board and Tribal Enrollment Committee

22   agreed.  The Tribal Election Board and Enrollment Committee worked with BIA to establish a Voters

23   List for the Special Election. In September 2010, then-Acting Director of the Pacific Regional Office,

24   Dale Risling, delivered an ultimatum that DOI would only agree to a Special Election if the

25   disenrollees were allowed to vote without requiring any proof of eligibility.  The Tribal Election

26   Board offered to use the Voters List developed by DOI if DOI would restrict the list it to those who

27   had some proof of eligibility, as promised by George Skibine, but DOI did not respond to the offer,

28   and ceased election communications. DOI did not seek concessions from the Gholson Faction.

         102.   The Tribal Election Board began preparations for the annual General Election without

1 DOI assistance. In September 2010, the Tribal Enrollment Committee conducted its annual review of

2 the tribal membership list and consulted with the Tribal Election Board as it prepared the 2010 Voters

3 List, adding newly of-age voters to, and deleting disqualified and deceased voters from, the 2009

4 Voters List.  On November 9, 2010, the Tribal Election Board conducted the annual General Election

5 for the two open Tribal Council seats.  The Tribal Election Board informed the General Council of the

6 results.

7    103. On November 18, 2010, the Tribal Election Board certified that one appeal had been

8 submitted, but then withdrawn, and that the winners of the election were Angie Boland and Hillary

9 Frank.  The Election Board announced the results to the General Council and DOI.  The 2010 Tribal

10 Council thus consisted of Chairman Joe Kennedy, Vice Chair Angie Boland, Secretary-Treasurer

11 Grace Goad, and Council Members Erick Mason and Hillary Frank ("2010 Death Valley Tribal

12 Council").  DOI did not object to the conduct of the General Election.

13       **THE FIRST AND SECOND ECHO HAWK DECISIONS**

14    104. March 1, 2011, Echo Hawk issued his decision in the appeal from Dale Morris's

15 February 17, 2009 decision to recognize the 2006 Tribal Council ("EHD I").  Exhibit A.  Echo Hawk

16 affirmed Morris's rejection of the resolutions passed by the General Council of the Tribe on January

17 20, 2008, recognizing the Kennedy-led Tribal Council as the Tribe's lawful Tribal Council. Echo

18 Hawk also rejected the General Council's resolution interpreting the term "resign" in the Tribal

19 Constitution.  Relying on Burdick III, Echo Hawk found that there had been a hiatus in government-

20 to-government relations since February 2010.  In his decision, Echo Hawk found that approximately

21 74 individuals had not been validly disenrolled from the Tribe.  He temporarily recognized the

22 Gholson Faction to carry out an election that would include the disenrollees.

23    105. EHD I was premised on the incorrect premise that DOI did not recognize the Death

24 Valley Tribal Council after August 25, 2007.

25    106. EHD I defined the issue presented in the Beaman Appeal as whether the Special

26 General Council Meeting on January 20, 2008 had the authority to "emplace" the 2007 Death Valley

27 Tribal Council.  The EHD I did not address the November 13, 2007 Tribal Election Board-

28 administered General Election or Beaman's Election Mark II as requested by the Beaman Appeal.

   107. EHD I rejected the General Council's legal interpretation of the term "resign" under

1  tribal law with his own dictionary definition and thus found that Mr. Beaman and Ms. Beck had not

2  resigned from the Tribal Council.

3  108.   EHD I ignored the Tribal Election Board-administered General Elections in 2008,

4  2009, and 2010 despite the fact that they were administered by the same Tribal Election Board that

5  administered all previous elections recognized by DOI, and despite the fact that none of the elections

6  had been appealed to the Tribal Election Board under the Tribal Election Ordinance by anyone much

7  less the Beaman or Gholson Factions. EHD I did not consider the facts that neither the Beaman nor

8  the Gholson Faction held its own election in 2008 and BIA served as an independent observer of the

9  2009 General Election.  The only election EHD I did consider was the Tribal Election Board and

10 Gholson elections of 2010 that took place long after DOI closed the Record.

11 109.   EHD I found that DOI had the authority to recognize a private entity, the Gholson

12 Faction, to carry out an election on DOI's behalf ("DOI Election").  The basis for the EHD I

13 recognition of Gholson was that DOI disagreed with the Tribal Enrollment Committee's decision

14 (which it mischaracterized as the decision of the Death Valley Tribal Council) to remove 74

15 individuals from the membership list.  Echo Hawk wrote that the disenrollment violated tribal law

16 and the Indian Civil Rights Act ("ICRA"), but did not explain his reasoning.

17 110.   Shortly after issuing EHD I, DOI funded Gholson to conduct the DOI Election on

18 April 29, 2011.  Based on Echo Hawk's assurance that the DOI Election would comply with tribal

19 law, the Death Valley Tribal Council decided to take part in the DOI Election rather than immediately

20 challenge the EHD in this Court.  Gholson put the names of the members of the Death Valley Tribal

21 Council on the DOI Election ballot, but only allowed non-Death Valley Tribal Council candidates to

22 provide campaign statements to the voters, giving the appearance that the Death Valley Tribal

23 Council had not seen fit to ask for members' votes.

24 111.   Plaintiffs are informed and believe and on that basis allege, that when the Death Valley

25 Tribal Council complained of violations of tribal voters' civil rights protected by tribal and federal law

26 to Echo Hawk and other DOI officials, DOI informed the Gholson Faction to proceed as it saw fit.

27 112.   Over 20% of the General Council appealed the outcome of the DOI Election to the

28 Gholson Faction's Election Committee pursuant to the Tribal Election Ordinance – without admitting

that the DOI Election or the Gholson Faction were legitimate.  The appellants requested access to

1   election documents and complained of violations of their civil rights, including voting rights,

2   protected under federal and tribal law.  After declaring that it would not address most issues raised by

3   appellants, the Gholson Faction scheduled a hearing on the appeal at which no documents were

4   provided and no words were spoken except by the appellants.  The Gholson Faction provided no

5   response to appellants whatsoever.

6       113.   On July 29, 2011, one month after the Gholson Faction's recognition under EHD I

7   expired, Echo Hawk issued a decision recognizing the election held by the Gholson Faction ("EHD

8   II").  Exhibit B.  Relying on an unpublished report by the BIA (since disclosed in United States'

9   Motion to Dismiss as ECF No. 48-2), the new decision found that the election had been held in

10   compliance with Tribal law, and that the Gholson Faction's Election Committee had heard appeals by

11   the Kennedy Faction and other tribal member voters.  Echo Hawk wrote that "This letter follows

12   inexorably from the March 1 Order's provisions for holding a special election."  EHD II at 4.

13       114.   Although it had allowed EHD I to lapse for one month, DOI delayed publication until

14   after 5:00 p.m., Friday, July 29, 2011, which  DOI knew was the day that Plaintiffs were scheduled to

15   file their First Amended Complaint with leave of the Court.

16       115.   EHD II did not give its reasoning or the basis for the decision as required by the APA.

17   It did not acknowledge or consider the facts that the Gholson Faction abridged Plaintiffs' and other

18   appellants' right to free speech by preventing the members the Death Valley Tribal Council from

19   campaigning in the DOI Election, prevented any tribal members from challenging or otherwise

20   verifying any ballots, tally sheets, or voters lists, or that any of the other violations of tribal law that

21   the Death Valley Tribal Council brought to DOI's attention before and after the DOI election took

22   place.  DOI prevented Plaintiffs from obtaining any administrative review of EHD II by making it

23   immediately final for the Department. Therefore, the only means to review of EHD II is in this Court.

24       116.   With respect to the elections of  2007, 2008, 2009, and 2010, DOI before and after

25   EHD I has refused to be bound by the certifications of the independent Tribal Election Board. EHD II

26   asserted that DOI is bound to defer to the Election Committee it installed.

27       117.    For four years, DOI interfered with internal tribal membership and election affairs,

28   and the Death Valley Tribal Council could not seek judicial review because none of DOI's decisions

were final.  Now that DOI has finally issued a final decision, the Department seeks to prevent judicial

1   review by cloaking it in a newfound and specious respect for tribal sovereignty.

2        118.    EHD I relied upon Burdick III to demonstrate the long hiatus in recognition and EHD

3   II mentioned the fact that it was issued, but neither discussed the fact that Burdick III had been

4   appealed by the Kennedy Faction, which rendered it legally ineffective under 25 CFR Part 2.

5        119.    DOI concedes that it cannot make tribal membership decisions or determine the

6   outcome of elections unless a Tribe delegates that authority to the Department.  DOI contends that it

7   avoided doing so by refraining from examining whether nonmembers were allowed by the Gholson

8   Faction to vote and hold office.  However, DOI's "nondecision" on membership was in fact and

9   legally a decision on membership since DOI, rejected the Tribal Enrollment Committee's decision on

10  enrollment, and imposed the Gholson Faction on the Tribe knowing that it could not and would not in

11  the future limit voting and holding office to members of the Timbisha Tribe.  DOI decided that the

12  membership requirement in the Timbisha Constitution was insignificant and could be dispensed with

13  – in effect, nullified – by the Faction that DOI selected and imposed on the Tribe.

14       120.    EHD I relied upon the February 19, 2010 Scheduling Order's finding that the

15  September 2008 disenrollments had been found ineffective.  Neither the Scheduling Order nor the

16  EHD cite any basis for Echo Hawk's authority to make a membership decision for a tribe that has not

17  delegated that authority to DOI.  Nor did the Scheduling Order nor the EHD cite any basis for

18  rejecting the disenrollments under tribal law.

19                          **DOI ANIMOSITY TOWARD PLAINTIFFS**

20       121.    DOI has acted with animus and improper, discriminatory intent in making the two

21  decisions challenged in this action.

22       122.    As individuals and on behalf of the Tribe, Plaintiffs joined with other Western

23  Shoshone tribes, the Western Shoshone National Council, Western Shoshone Defense Project,

24  nonprofit native and environmental organizations, and Shoshone individuals, to bring no less than

25  five suits against federal agencies pertaining to the Western Shoshone homelands in the last four

26  years.  The lawsuits have sought, among other things: to regain the Western Shoshone ancestral

27  homelands, which extend from southern Idaho, through Nevada, to eastern California; to prevent

28  mining on those homelands, particularly on sacred mountains; to prevent storage of high-level nuclear

waste under Yucca Mountain; to force federal agencies to account for funds managed in trust for the

1    Western Shoshone; and to stop distribution of funds belonging to the tribes.  The campaigns have

2    resulted in press coverage in the United States and abroad.

3        123.    Some of the Plaintiffs in this Complaint are also plaintiffs in two lawsuits seeking to

4    prevent mining on Western Shoshone ancestral lands in Nevada and in a third lawsuit in the D.C.

5    Circuit contesting the federal government's management and disbursement of the Western Shoshone

6    Claims Judgment.  Plaintiff Joe Kennedy and other lawfully elected members of the Timbisha

7    Shoshone Tribal Council, most of whom are Plaintiffs in this action, sued the Secretary of the Interior

8    to stop the DOI from taking the Tribe's share of the Western Shoshone judgment fund and

9    distributing that fund to various individuals.  The DOI has argued in that case that its recognition of

10   the Gholson Faction deprived the Plaintiffs of their authority as the government of the Timbisha

11   Shoshone Tribe.  The Court of Appeals for the D.C. Circuit dismissed the appeal on that basis on May

12   15, 2012.  *Timbisha Shoshone Tribe v. Salazar*, No. 11-5049.  Plaintiffs in that case intend to seek a

13   rehearing.

14       124.    Plaintiffs raised human rights violations under international law leading to adverse

15   findings against the United States first by the Inter-American Commission on Human Rights

16   ("IACHR") of the Organization of American States and later by the United Nations Committee on the

17   Elimination of Racial Discrimination ("CERD").  In 2002, the IACHR found that the United States

18   had failed to provide equal protection of law to Western Shoshones who claimed property rights in

19   the Western Shoshone ancestral lands, and recommended measures to prevent further violation of

20   Western Shoshone human rights.  The IACHR periodically requests updates, forcing the United States

21   to publicly refuse to implement the decision of the IACHR.

22       125.    In 2006, CERD issued Early Warning and Urgent Action Decision 1(68) under the

23   International Convention on the Elimination of All Forms of Racial Discrimination to which the

24   United States is a party.  Decision 1(68) found that the United States' actions on ancestral Western

25   Shoshone homelands had led to a failure to meet the United States' obligations under the Convention.

26   CERD annually urges the United States to comply with Decision 1(68), forcing the United States to

27   publicly refuse to comply.

28       126.    Plaintiffs have given public testimony in support of the human rights of Timbisha and

     the Western Shoshone at United Nations and other international organizations.  In all international

SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF                    27                    CASE NO. 2:11-CV-00995-MCE-DAD

1   travel, Chairman Kennedy uses his Western Shoshone passport, not a United States passport.  The

2   press has taken note of both his statements and the fact that he has traveled on a Western Shoshone

3   passport, to the chagrin of the United States Department of State.  During a summit between the

4   President of the United States and tribal leaders, Chairman Kennedy gained widespread attention

5   when he called for the United States to ratify the Declaration on the Rights of Indigenous Peoples.  In

6   December 2010, the United States reversed its policy and announced its support for the Declaration.

7   Joe Kennedy's actions, however, have earned him the particular enmity of the federal government.

8                                    **FIRST CLAIM FOR RELIEF**

9    **Violation of the APA and DOI Regulations and Denial of Due Process of Law (5 USC §§
     701-706; 25 CFR Part 2; U.S. Constitution, 5th Amendment, Federal Common Law)**
10

11          127.    Plaintiffs hereby incorporate by reference paragraphs 1 through 126 of this Complaint

12   as if each were set forth herein.

13          128.    The EHD is arbitrary, capricious, and otherwise not in accordance with law, violates

14   Plaintiffs' right to due process of law, is in excess of DOI's legal authority, and fails to comply with

15   procedures required by law, including DOI's own regulations at 25 CFR Part 2, all in violation of 5

16   USC §§ 701-706.

17          129.    The EHD recognized the Gholson Faction based solely on information that was not

18   included in the Record provided by the AS-IA, in violation of Plaintiffs' right to due process of law

19   and the regulations that govern the AS-IA's decision-making authority at 25 CFR Part 2.  DOI's

20   regulations permit the AS-IA to consider information from outside of the record on appeal, but

21   requires that if he does, he,

22              [S]hall notify all interested parties of the information and they shall be
                given not less than 10 days to comment on the information before the
23              appeal is decided. The deciding official shall include in the record
                copies of documents or a description of the information used in arriving
24              at the decision.

25   25 CFR § 2.21(b).  The AS-IA neither notified Plaintiffs that he intended to consider information

26   outside the Record nor gave them an opportunity to file briefs or other evidence addressing the

27   validity or legal significance of that information.

28          130.    As the basis for EHD I, the AS-IA relied upon the fact that allegedly more "votes" had

     been cast in the 2010 Gholson election than in the 2010 Tribal Election Board-certified election. The

1  Gholson election was conducted in a private office in Bishop, three hours from the Reservation, under

2  no tribal authority.  None of the facts concerning the election were part of the Record provided by the

3  AS-IA, and Plaintiffs did not have any opportunity to contest those facts in an adversarial process.  As

4  the basis of EHD II, the AS-IA relied upon unverified information supplied by Gholson, a non-party

5  to the administrative appeal, over a year after the Record closed.  The information Gholson supplied

6  is one-sided and was not subjected to adversarial process.  Nor did DOI subject that information to

7  reasoned analysis.

8       131.    If Plaintiffs had been given reason to believe that the AS-IA was contemplating

9  recognizing the Gholson Faction, they would have addressed the invalidity of the Gholson Faction,

10  the ineligibility of Gholson and Jackson to serve on the Tribal Council, even temporarily, and the

11  irrelevance and unreliability of the number of purported votes cast in the Gholson Faction's

12  "election", among other things.  In their Statement of Reasons submitted to Echo Hawk in March

13  2010, Plaintiffs noted that the Gholson Faction had withdrawn its appeal and requested an opportunity

14  to address the Gholson matter if the AS-IA intended to consider it.

15  **SECOND CLAIM FOR RELIEF**

16  **Interference with Internal Tribal Affairs in Excess of DOI's Legal Authority and Failure to
17  Defer to Tribal Bodies' Interpretations of Tribal law, both in Violation of the APA, DOI Rules,
and Federal Common Law (5 USC §§ 701-706; 25 CFR Part 2; Federal Common Law)**

18       132.    Plaintiffs hereby incorporate by reference paragraphs 1 through 131 of this Complaint

19  as if each were set forth herein.

20       133.    Federal common law and DOI rules require that in order to protect the

21  self-determination of Indian tribes, DOI must defer to the interpretations of tribal law by tribal

22  law-applying bodies and DOI must not entertain administrative appeals of its recognition of a tribal

23  election by a party that has not exhausted its tribal remedies.  On its face and implicitly, EHD

24  flagrantly disregards both rules arbitrarily and capriciously and in excess of DOI's legal authority, and

25  thus violates the APA.

26  **Failure to Defer to Interpretations of Tribal Law by Tribal Law-Applying Bodies.**

27       134.    Under federal common law, DOI is bound by the decisions of tribal law-applying

28  bodies, regardless of whether DOI disagrees with them.  Tribal law-applying bodies may include

tribal courts, General Councils, Tribal Election Boards, or similar bodies.  *Santa Clara Pueblo v.*

1  *Martinez*, 436 U.S. 49 (1978); *Wheeler v. DOI*, 811 F.2d 549 (10th Cir. 1987).  That principal has

2  been confirmed in DOI decision law by the IBIA and AS-IA under the regulations that apply to

3  appeals to the IBIA and AS-IA.

4       135.    Nonetheless, DOI disregarded the decisions of tribal law-applying bodies that existed

5  long before the current dispute between the Death Valley Tribal Council and DOI began in 2007.  The

6  Tribal Election Board and Tribal Enrollment Committee are both law-applying bodies independent of

7  the Tribal Council that have existed in their current form since at least 1986.  In the General Elections

8  of 2007, 2008, 2009, and 2010, the Tribal Election Board applied tribal law to establish the list of

9  registered voters and certified the General Elections, which were not appealed.  The General Council,

10  of course, has existed so long as there have been Timbishas, but has operated in its current form since

11  adoption of the Constitution in 1986.  On January 20, 2008, the General Council interpreted an

12  undefined term – "resign" – in the Tribe's own Constitution, ratified certain actions of the Death

13  Valley Tribal Council exercising authority delegated from the General Council, and confirmed the

14  propriety of the election of the 2007 Death Valley Tribal Council in the 2007 General Election.

15       136.    EHD I admitted that it deliberately ignored the 2007 General Election.  The EHD I

16  deemed it not to be the issue presented by the Beaman Appeal despite the fact that the Beaman

17  Appeal specifically sought review of the Tribal Election Board's 2007 General Election and the

18  Beaman Factions' gaming developer-funded election held on the same day.  The EHD I completely

19  ignored the 2008 and 2009 Tribal Election Board-administered and -certified General Elections

20  despite the fact that they are in the Record and of significant legal import to DOI's authority to

21  continue entertaining the Beaman Appeal, giving no reason for the omission.  The EHD I also does

22  not consider the decision of the Tribal Election Board to certify the outcome of the January 20, 2008

23  Special General Council Meeting, which it overrules *sub silentio*.

24       137.    The EHD I admitted that it overruled the decision of the January 20, 2008 Special

25  General Council Meeting.  In fact, the decision by Echo Hawk to disregard the decision of the General

26  Council is the crux of the EHD.  The EHD did not offer any authority for overruling the decision of a

27  tribal law-applying body.  The EHD I did not cite any authority for disregarding DOI's own decisional

28  law embodied in AS-IA and IBIA opinion requiring the agency to defer to the interpretation of tribal

law by tribal law-applying bodies.  Thus, the basis for the EHD, Echo Hawk's disagreement with the

1  General Council's decisions, violates DOI decisional law, federal common law, and the APA.

2      138.    This Court need not interpret tribal law to find that the EHD disregarded the

3  interpretation of tribal law by tribal law-applying bodies in violation of DOI rules and federal

4  common law.  The EHD I admitted on its face that it rejected the interpretation of tribal law adopted

5  by the January 20, 2008 Special General Council Meeting.  The Tribal Election Board and General

6  Council decisions appear in the Record.  To find that the EHD exceeded DOI's authority, this Court

7  need only take notice of existence of the fact of those tribal decisions and apply federal common law

8  and the APA to those facts.

9      139.    In EHD II, Echo Hawk finally remembered the rule that DOI must defer to tribal

10  interpretations of tribal law as Plaintiffs argued to DOI for nearly five years. EHD II, however,

11  applied the rule disingenuously in its argument that DOI must abide by the decision of the Gholson

12  Faction to approve of its own election, even though both the entity and election were brought into

13  existence by action of DOI in 2011, nearly four years after the dispute between the Death Valley

14  Tribal Council and DOI arose.  Disregarding the interpretations of tribal law by long-standing tribal

15  entities, and then claiming to be bound by an entity installed by DOI itself is arbitrary and capricious,

16  violating the APA.

17                          **Failure to Require Exhaustion of Tribal Remedies**

18      140.    Pursuant to DOI decisional law established in adjudications before the IBIA and the

19  AS-IA, pursuant to DOI regulations governing appeals before the IBIA and AS-IA, DOI may not

20  consider, and must dismiss, any appeals of a DOI decision to recognize or deny recognition to a tribal

21  government if the appellant has not exhausted their tribal remedies.  Those tribal remedies may be in

22  a tribal court, the General Council, Tribal Election Board, or other law-applying body.

23      141.    Under federal common law, parties may not appeal DOI recognition decisions if they

24  have not exhausted their tribal remedies.  It is admitted on the face of the EHD I that the appellants in

25  the administrative appeals that resulted in the EHD I did not exhaust their tribal remedies.  The EHD I

26  admitted that the Beaman Faction did not appeal the 2007 General Election to the Tribal Election

27  Board, which conducted the 2007 General Election and all tribal elections before that.  Beaman's

28  attorneys drafted both the "appeal" and the "decision" by Beaman's election committee created solely

for the purpose of submitting it to DOI to avoid the requirement to exhaust tribal remedies. Thus,

1   from facts appearing on the face of the EHD, it is clear that it violated both federal common law and

2   DOI decisional law by not requiring exhaustion of tribal remedies.  Moreover, it is uncontested in the

3   Record that the Beaman Faction did not appeal the outcome of the Special General Council Meeting

4   of January 20, 2008.  This Court need not interpret tribal law to find that the Beaman Faction did not

5   exhaust its tribal remedies, only federal law and the facts in the Record.

6          142.    Pursuant to DOI decisional law established in adjudications before the IBIA and the

7   AS-IA, pursuant to DOI regulations governing appeals before the IBIA and AS-IA, DOI must dismiss

8   appeals of DOI recognition decisions as moot if the tribe conducts an election during the pendency of

9   the administrative appeal that is not itself also appealed through the tribal appeals process.  It is

10  uncontroverted on the Record that no party appealed the 2008 General Election conducted by the

11  Tribal Election Board.  The Tribal Election Board, which had conducted and certified all previous

12  tribal elections, certified the results of the 2008 General Election.  The Record reflects that neither the

13  Beaman Faction nor the Gholson Faction purported to hold an election that year, and did not appeal

14  the 2008 General Election.  This Court need not interpret tribal law to find that the 2008 General

15  Election was not appealed, rendering the Beaman Appeal moot, only federal law – DOI decisional law

16  – and the facts in the Record.

**THIRD CLAIM FOR RELIEF**

17

**Interference with Tribal Membership Decisions in Excess of DOI's Legal Authority, Failure to
Defer to Tribal Bodies' Interpretations of Tribal law, both in Violation of the APA, DOI Rules,
and Federal Common Law (5 USC §§ 701-706; 25 CFR Part 2; Federal Common Law)**

18

19

20         143.    Plaintiffs hereby incorporate by reference paragraphs 1 through 142 of this Complaint

21  as if each were set forth herein.

22         144.    DOI decisional rules and federal common law pertaining to tribal membership

23  absolutely bar DOI interference with tribal membership decisions.  Federal common law and DOI

24  decisional law prohibit DOI from making any tribal membership decisions without explicit tribal or

25  congressional authority.  As this Court noted, DOI committed not to interfere in the disenrollment

26  dispute.  *Timbisha Shoshone Tribe v. Kennedy*, 687 F.Supp.2d 1171, 1185 (2009) ("It has long been

27  the policy of the Department of the Interior and the BIA, in promoting self-determination, not become

28  involved in the internal affairs of tribal governments.").

           145.    EHD I attempts to circumvent the prohibition against DOI intervention in tribal

1   membership decisions by asserting (1) that the disenrollments were done by the Tribal Council, (2)

2   that the Tribal Council was not recognized at the time, and (3) that DOI may therefore ignore those

3   disenrollments.  The Record demonstrates that the disenrolled individuals with whom DOI is

4   concerned were removed from the membership list not by the Tribal Council, but by the independent

5   Tribal Enrollment Committee a competent law – applying today.  The Record demonstrates that DOI

6   has never called the legitimacy of the Tribal Enrollment Committee into question at any time.  At the

7   time of the disenrollments in question, the Death Valley Tribal Council was recognized *de jure* and *de*

8   *facto* by DOI and other federal agencies.

9         146.    Even if the issue were whether the Death Valley Tribal Council was recognized at the

10  moment it issued resolutions agreeing with the Tribal Enrollment Committee's finding that the

11  disenrollees had never demonstrated their eligibility for tribal membership, the Record reflects that

12  the DOI decisions recognizing the Death Valley Tribal Council were still in effect at that time,

13  meaning that Tribal Council was recognized *de jure* and *de facto* by DOI.

14        147.    The Court need not interpret tribal law, but only review the Record and compare it to

15  DOI's version of the facts in the EHD to find that the basis of the EHD's decision to disregard the

16  membership decision of the Tribal Enrollment Committee violates the APA.

17        148.    EHD I, does far more than just reject the removal of the disenrollees from the list of

18  registered voters y the Tribal Election Board on procedural grounds.  The EHD I decision to recognize

19  the Gholson Faction is founded on DOI's own substantive tribal membership decision.  Echo Hawk

20  found that he would not recognize the 2010 Death Valley Tribal Council because "Mr. Kennedy"

21  supposedly prevented the disenrollees from voting in the 2010 General Election.  Echo Hawk found

22  that he would recognize the Gholson Faction because it purported to allow those disenrollees to vote.

23  None of those facts pertaining to either 2010 election are in the Record, however.

24        149.    EHD I did not address the facts, which are in the Record, that the Tribal Election

25  Board, not the Tribal Council or Mr. Kennedy, conducts General Elections, generates the list of

26  registered voters, and certifies the results.  The fact that the 2010 General Election was conducted by

27  the Tribal Election Board, like all previous elections, is not in the Record, but if Echo Hawk had

28  followed the requirements of 25 CFR § 2.21, Plaintiffs would have briefed the facts of the 2010

     General Election for him.

150.    EHD I unlawfully makes the substantive tribal membership decision that the disenrollees must be allowed to vote, and that DOI will not recognize any election in which they are not permitted to vote, effectively replacing the Tribal Election Board, a competent tribal law applying body, with the AS-IA for the purpose of generating the list of registered voters.  In fact, the disenrollees have more protection for their right to vote than the registered voters of the Tribe who may still lose their right to vote due to a felony conviction, among other things.

151.    Both federal common law and DOI decisional law requires that DOI have explicit tribal or congressional authority before it may make any membership decisions.  EHD I made the substantive tribal membership decision that the disenrollment violated the Indian Civil Rights Act and tribal law, but merely made reference to the federal Indian Civil Rights Act ("ICRA") and tribal law without identifying a source of authority for DOI to make such a membership decision, because there is no such authority for the decision.  Even assuming that DOI had authority to make membership decisions, EHD I does not give any explanation of the supposed violations of the ICRA or tribal law.

152.    EHD I did not address the fact that over-expansion of the right to vote (vote dilution), which the EHD forced on the Tribe, is recognized by federal law as just as grave a violation of the right to vote as the over-restriction of the franchise.  As the Record reflects, the Tribal Election Board only allows those who have shown eligibility for membership in the Tribe to vote and that the disenrollees could have sought, and may still seek, to be added to the list of registered voters at any time by presenting proof of eligibility for membership in the Tribe.  By preempting that tribal process, DOI has disregarded federal common law and DOI decisional law (1) requiring that DOI defer to the decisions of tribal law-applying bodies, and (2) prohibiting DOI from making tribal membership decisions without explicit tribal or congressional authority, and thus violated the APA.

153.    The EHD on its face demonstrates that DOI made a membership decision adding 74 disenrollees to the list of registered voters.  Neither the EHD nor the Record contain any tribal or congressional grant of authority to DOI to make tribal membership decisions.

154.    Even if the EHD could have lawfully delved into tribal membership decisions, which it could not absent explicit tribal or congressional authorization, DOI is bound by its own regulations not to recognize the disenrollees as tribal members.  As part the 1982 recognition of the Tribe pursuant to 25 CFR Part 83, DOI found that the 192 individuals on the 1978 Base Roll represented all

1  known members of the Tribe, and pursuant to 25 CFR § 83.12, DOI is prohibited from recognizing

2  any individual added to the Tribe's Membership list who does not meet the original criteria for

3  membership approved by DOI.  The Record reflects the uncontroverted fact that none of the

4  disenrollees appear on the 1978 Base Roll, and that Gholson, Jackson, and many other disenrollees

5  were born long before 1978.  Moreover, information supplied by Gholson directly to DOI (1) admits

6  that he is not on the 1978 Base Roll, and (2) bases his claim for membership on a ground that was

7  *rejected* as a basis for tribal membership in the Tribe's application for recognition in 1979.  That

8  decision, approved by DOI, is reflected in DOI's findings published in 1982 which are included in the

9  Record.  Thus, based solely on the Record and its own regulations, before even considering tribal law,

10  DOI could not reasonably find that Gholson and others similarly situated are eligible for membership

11  in the Tribe.  Even if it were not arbitrary and capricious and a violation of law for DOI to make a

12  tribal membership decision, it would be arbitrary and capricious for DOI to make such a decision

13  without considering its own regulations at 25 CFR Part 83 governing DOI's treatment of tribal

14  membership, and the facts in the Record pertaining to the membership in the Tribe of individuals it

15  intended to recognize to carry out an election on its behalf, and would therefore violate the APA.

16  ///

17  ///

18  ///

19  ///

20  ///

21

22

23

24

25

26

27

28

**FOURTH CLAIM FOR RELIEF**

**Interference with Internal Tribal Affairs in Excess of DOI's Legal Authority by Artificially Manufacturing a Hiatus in Federal Recognition of a Tribal Government Notwithstanding the Existence of a Tribal Government, in Violation of the APA, DOI rules, and Federal Common Law (5 USC §§ 701-706; 25 CFR Part 2; Federal Common Law)**

155.    Plaintiffs hereby incorporate by reference paragraphs 1 through 154 of this Complaint as if each were set forth herein.

156.    Under federal common law, DOI may not permit a hiatus in recognition of a tribal government. *Goodface v. Grassrope*, 708 F.2d 335, 339 (8th Cir. 1983).  Under *Goodface*, the court found that it had jurisdiction to require BIA to "recognize and deal with some tribal governing body in the interim before resolution of the election dispute [by the Tribe]," but not to resolve the election dispute itself. *Id.*  The court found that, "the BIA should be required to deal with the [most recently elected] council as the certified and sworn winners of the tribal election." *Id.*  In other words, the *Goodface* court respected tribal self-government by presuming that the tribe's election board had conducted a valid election, and that the BIA should recognize the new Tribal Council until the appeals within the tribe found otherwise.

157.    Echo Hawk's February 19, 2010 Scheduling Order and Burdick's February 24, 2010 decision ("2010 Decisions"), which were both written principally by the same DOI attorney, take the position that DOI could not recognize any Timbisha tribal government because the last uncontested tribal government had been the 2006 Death Valley Tribal Council, which had expired.  The 2010 Decisions did not explain why DOI had to create a hiatus in the government-to-government relationship when DOI had been working with the 2007 and 2008 Death Valley Tribal Councils on a government-to-government basis, and could have recognized the Tribal Election Board-certified election of the 2009 Death Valley Tribal Council just three months earlier consistent with *Goodface*. Inexplicably, the 2010 Decisions did not acknowledge the fact that DOI had been present at and observed the Tribal Election Board's conduct of the 2009 General Election and had not objected to it in any way.  The 2010 Decisions conflicted with the federal common law and with DOI decisional law established by the IBIA and AS-IA under the regulations applicable to those offices, which require that DOI not permit a hiatus in the government-to-government relationship.

158.    The purpose for creating the lapse in recognition was to force the tribal government to

1   comply with DOI's wishes that it permit the disenrollees to vote without submitting any proof of

2   eligibility.  That purpose is reflected in the Scheduling Order and in the written and oral

3   communications received from Deputy AS-IA George Skibine and the then-Acting Director of the

4   Pacific Regional Office, Dale Risling.  Skibine and Risling delivered ultimatums explicitly

5   demanding that the Tribe not insist on strict compliance with tribal election law, and demanding that

6   the Tribe permit the disenrollees to vote without demonstrating their eligibility.  When the Tribal

7   Election Board offered to permit disenrollees to vote if they submitted proof of eligibility, DOI ceased

8   communications.  The EHD then used the unnecessary hiatus in the government-to-government

9   relationship caused by the 2010 Decisions as justification for recognizing Gholson.  Revising the

10  history of the administrative appeals process to better suit DOI's preferred outcome, and to conceal

11  the deliberate violations of DOI rules and federal common law, is arbitrary and capricious, and thus

12  violates the APA.

13                                      **Rollback Rule**

14          159.    At some point between the *Goodface* case and the present, DOI adopted a policy that

15  stands *Goodface* on its head, and began recognizing a former and uncontested Tribal Council in every

16  case where there has been an appeal filed under 25 C.F.R. Part 2 challenging DOI acknowledgment of

17  current tribal election results ("Rollback Rule").  The Rollback Rule implicitly assumes that all tribal

18  elections are invalid until DOI, not the tribe, finds otherwise pursuant to 25 CFR Part 2.  This Court

19  discussed the Rollback Rule in *Timbisha Shoshone Tribe v. Salazar*, 697 F. Supp. 2d 1181, 1185

20  (E.D. Cal. 2010).  The Rollback Rule by definition results in the recognition of an expired Tribal

21  Council, often for years, while the appeals within DOI are resolved.

22          160.    The legitimacy of a tribal government derives from a mandate of the tribal

23  membership, not from recognition by DOI bureaucrats.  Therefore, legitimate Tribal Councils

24  continue to be elected during the pendency of the appeals within DOI, while DOI persists in

25  recognizing an expired Tribal Council.

26          161.    The Rollback Rule falls within the definition of a "substantive" rule subject to the

27  notice and comment rulemaking procedures of the APA.  The Rollback Rule is an agency statement

28  of both general and particular application in all current and future cases where an appeal has been

    filed challenging DOI recognition of tribal election results.  DOI purports to apply the Rollback Rule

1 uniformly, without regard to the circumstances of an individual case.  Under the APA, federal

2 agencies must promulgate agency rules by providing notice and an opportunity for comment.  DOI's

3 failure to promulgate its policy as a written rule and provide Indian tribes and the general public an

4 opportunity to comment is arbitrary, capricious, violates the APA's rulemaking procedures, and is

5 subject to judicial review under the APA, 5 U.S.C. §§701-706.

6      162.   The February 17, 2009, and March 24, 2009, decisions by then-Director of the Pacific

7 Regional Office, Dale Morris ("2009 Decisions"), relied upon the Rollback Rule, proposing to

8 recognize the 2006 Death Valley Tribal Council despite the fact that three seats had expired in

9 December 2007 and the remaining two expired in December 2008 – two months before the 2009

10 Decisions.  The 2009 Decisions were ineffective because they had been appealed pursuant to 25 CFR

11 § 2.6, but Burdick gave them practical effect when he refused to carry out his nondiscretionary duty to

12 approve the Tribe's annual self-determination contract in July of 2009.

13     163.   Echo Hawk's February 19, 2010 Scheduling Order and Burdick's February 24, 2010

14 decision ("2010 Decisions"), announced that DOI would no longer recognize any Timbisha tribal

15 government because the last uncontested Tribal Council, the 2006 Death Valley Tribal Council had

16 expired, implicitly rejecting the Rollback Rue without explanation for the change in direction from

17 the 2009 Decisions and from the de facto recognition of the Death Valley Tribal Councils.  The 2010

18 Decisions found that DOI could not recognize any Timbisha Tribal Council because by that late date,

19 not only had the 2006 Death Valley Tribal Council expired, but so had the 2007 Death Valley Tribal

20 Council, and so would have the Beaman Faction's purported Tribal Council if it had ever come into

21 existence.  Thus, the 2010 Decisions reject the Rollback Rule without explanation.

22     164.   If DOI cannot recognize a Tribal Council whose terms have expired, then the Rollback

23 Rule is per se invalid.  If the Rollback Rule is valid, then DOI may recognize expired Tribal Councils.

24 The two theories are mutually exclusive.  The EHD, however, depends on the validity of both the

25 Rollback Rule and the theory of the 2010 Decisions.  The EHD found that DOI never recognized any

26 tribal government after the 2006 Death Valley Tribal Council.  The EHD also found that it could not

27 recognize any Tribal Council whose members' terms had expired, such as the 2006, 2007, and 2008

28 Death Valley Tribal Councils and the theoretical 2007 Beaman "Council," which does not appear to

have ever met.  The alternative is that DOI simply refused to recognize any tribal government,

1  creating a nearly four-year hiatus in government-to-government relations in violation of *Goodface*.

2  The evidence in the Record rebuts the idea that DOI applied the Rollback Rule or created a four year

3  hiatus in government-to-government relations.  The Record supports the fact that DOI recognized the

4  2007, 2008, and 2009 Death Valley Tribal Councils while the appeals worked their way through DOI,

5  consistent with *Goodface*.

6         165.    Under *Goodface*, the logical choice in the EHD would have been to recognize the only

7  entity continuously elected from 1986 through 2010, the 2010 Death Valley Tribal Council, and to

8  presume that the Tribal Election Board, which had conducted all of the Timbisha elections ever

9  recognized by DOI, would conduct its duties properly at the next Special or General Election. The

10 EHD, however, applied the Rollback Rule to find that there was no valid government for the last four

11 years.  Under the Rollback Rule that would have led to "continued" recognition of the 2006 Death

12 Valley Tribal Council.  The EHD, however, dropped the Rollback Rule in favor of finding that DOI

13 could not recognize an expired Tribal Council.  Ignoring the history of the Tribal Election

14 Board-administered and -certified General Elections from 1986 through 2010, the EHD put the

15 Gholson Faction, established in 2009 in the middle of the dispute, on an equal dignity and reliability

16 with the Tribal Election Board, established in 1986, long before the present dispute.  As discussed

17 above, once DOI freed itself to recognize either Gholson or the Tribal Election Board, it decided,

18 based on facts not in the Record and on DOI's decision on tribal membership matters, to recognize

19 the Gholson Faction.

20        166.    The Rollback Rule was adopted outside of the proper rule making process of the APA,

21 is arbitrary and capricious, violates federal common law and DOI decisions requiring deference to

22 tribal law-applying bodies, and thus violates the APA.  Because the EHD relies upon the Rollback

23 Rule and on prior DOI decisions that rely on the Rollback Rule, it is arbitrary and capricious, violates

24 federal common law and DOI decisions requiring deference to tribal law-applying bodies, and thus

25 violates the APA.  The EHD is also internally inconsistent because it relies on the Rollback Rule,

26 which would permit the recognition of an expired Tribal Council, and on the theory that DOI cannot

27 recognize an expired Tribal Council.  The internal inconsistency is arbitrary and capricious, and thus

28 violates the APA.

### FIFTH CLAIM FOR RELIEF

**Violation of the APA by Relying on Irrelevant Factors and Ignoring Relevant Factors in Violation of DOI rules, federal common law, and the APA**
**(5 USC §§ 701-706; 25 CFR Part 2; DOI rules and Federal Common Law)**

167.   Plaintiffs hereby incorporate by reference paragraphs 1 through 166 of this Complaint as if each were set forth herein.

**The EHD Artificially Limited its Scope to the January 20, 2008 General Council Meeting**

168.   The EHD declares without the support of the Record, that the only question at issue is whether the January 20, 2008 Special General Council Meeting acted legitimately.  In the appeal that instigated the administrative appeals that culminated in the EHD, however, the Beaman Faction sought recognition of its own gaming developer-funded 2007 election over the 2007 General Election conducted and certified by the Tribal Election Board.  The EHD was written as if the 2007, 2008, and 2009 General Elections simply did not happen.  That omission is arbitrary and capricious since the gravamen of the EHD is the legitimacy of a tribal election, and thus violates the APA.

169.   The deliberate ignorance of the 2008 General Election which appears in the Record is inexcusable because, in addition to the fact that the 2008 General Election was not appealed and was certified by the Tribal Election Board, neither Bishop Faction purported to conduct an election in 2008.  The deliberate ignorance of the 2009 General Election is simply bizarre, since DOI acted as independent observer of the Tribal Election Board conduct of that election and did not object to the election.  The EHD's disregard for the 2007, 2008, and 2009 elections is unreasonable because the EHD reached out beyond the Record to consider the 2010 elections.  The decision to disregard important relevant information, and to give no legitimate reason for that disregard, both are arbitrary and capricious, and thus violate the APA.

170.   The EHD also made many mistakes of fact controverted by the Record.  Among other things, the EHD assumed without explanation that no quorum existed at the August 25, 2007 Death Valley Tribal Council meeting after Beaman, Beck, and Casey left.  The Tribal Council is governed by Robert's Rules of Order, which hold that once the quorum is established in a legislative body, it remains until a member of the body questions whether there is still a quorum.  The U.S. House of Representatives and U.S. Senate follow essentially the same rule.  The Death Valley Tribal Council repeatedly brought that fact to the attention of Echo Hawk, but he chose to ignore it.  The EHD also

1   incorrectly assumed that the evidence of only the signatures of Madeline Esteves and Joe Kennedy on

2   a tribal resolution indicated they were the only two Tribal Council members at the meeting.  As the

3   Record reflects, Death Valley Tribal Council resolutions are only signed by the Secretary-Treasurer

4   and the Chairman to attest to the legitimate adoption of the resolution.

5          **The EHD Did Not Consider the Violations of Plaintiffs' Civil Rights in the DOI Election**

6          171.    Although the EHD finds that it cannot recognize the Death Valley Tribal Council on

7   the basis of the purported violation of one man's civil rights – Ed Beaman – it does not recognize at

8   all the deprivation of the civil rights of the five Plaintiffs who were candidates in the DOI Election

9   and of the 20% of voters who appealed the DOI Election.  Although Gholson included the Death

10  Valley Tribal Council members' names on the DOI Election ballot, he refused to include their

11  campaign statements with the ballots.  The campaign statements are generally the only means for the

12  candidates to communicate with voters, thus the abridgement of the freedom of speech in the DOI

13  Election was particularly egregious since it censored political speech based on the views expressed in

14  that political speech.  Further, DOI is well aware, soon after EHD I, Gholson gained entry to the

15  Tribal Administration Building and removed Plaintiffs' postage machine and all of its printer paper,

16  effectively preventing them from communicating by mail.

17               **The EHD Did Not Consider the Purposes of the Homeland Act**

18         172.    The Homeland Act set aside the Timbisha Reservation as the seat of tribal

19  government, as the area over which the Tribe may exercise its governmental authority, construct tribal

20  housing, and conduct economic development.  The Homeland Act recognized the direct predecessors

21  of the Death Valley Tribal Council, which have governed the Tribe from Death Valley since time

22  immemorial.

23         173.    In contrast to the Homeland Act, the EHD recognized the Gholson Faction, which

24  operates out of a private office, in Bishop, CA, rented for it by GIE.  It is located 160 miles from the

25  Reservation, but across the street from the Bishop Paiute Reservation.  The Record reflects that the

26  Bishop Factions, through their words and their actions, have wholly rejected the use of the

27  Reservation established by the Homeland Act for government, housing, cultural preservation, and

28  economic development purposes.  Their only goal is to obtain a reservation in Hesperia for gaming

    purposes.  The Homeland Act forms an important basis for any decision concerning Timbisha because

1  it defines Congress's understanding of the Tribe.  Despite the fact that the Bishop Factions' clear

2  intentions on the Record, the EHD did not consider the purposes of the Homeland Act, which is

3  arbitrary and capricious, in conflict with the Homeland Act, and thus in violation of the APA.

4            **The EHD Ignored Evidence in the Record of Corruption in the Bishop Faction**

5            174.    Plaintiffs are informed, believe, and on that basis allege that Gholson and his cousins

6  have personally received several hundred thousand dollars in cash, free cars, trips, and other benefits

7  from gaming developers aimed at inducing them to sign development agreements in the name of the

8  Tribe without informing the tribal membership.  That practice has continued with Gholson's cousins

9  recently appropriating the contents of a tribal bank account without informing the tribal membership.

10  Gaming developer interference with internal tribal affairs violates the IGRA, and the Record reflects

11  evidence of the corruption of the Bishop Factions by gaming developers, but DOI fails to address

12  those facts despite their importance to whether DOI may reasonably expect the Gholson Faction to

13  conduct a legitimate election on DOI's behalf, and thus violates the APA.

14            175.    Moreover, Plaintiffs are informed, believe, and on that basis allege, that the Gholson

15  Faction has committed the Tribe to repay over $1 Million it owes to GIE for its assistance in getting

16  DOI to recognize the Gholson Faction as the tribal government.  Although the facts of the support of

17  the Gholson Faction appears in the Record, the EHD does not address the disruption to a poor tribe

18  that would be caused by such a large obligation incurred without the agreement of Tribe itself.

19                **The Record and EHD Reveal DOI Animus Toward Plaintiffs**

20            176.    Evidence of animus toward Plaintiffs, particularly Chairman Kennedy, is revealed by

21  the actions of DOI during the pendency of the administrative appeal.  Plaintiffs are informed, believe,

22  and on that basis allege that the EHD is based in significant part on the animus DOI bears for

23  Plaintiffs in general and Chairman Kennedy and Pauline Esteves in particular for their part in

24  continually challenging DOI's treatment of the Western Shoshones in general and the Timbishas in

25  particular over the last four decades in the United States and abroad.  A decision motivated by animus

26  is by definition arbitrary and capricious, and violates the APA.

27            177.    The EHD accuses Pauline Esteves of being a felon in order to argue that she was

28  ineligible for election to the Tribal Council in the 2007 General Election.  The accusation is reckless

or deliberately mischaracterizes the facts in the Record, which clearly reflect that Pauline Esteves

1    pleaded nolo contendere to a misdemeanor.  She was charged with a misdemeanor for carrying out

2    activities in her home, then prohibited by discriminatory park regulations.  Those same activities

3    would not have been considered "criminal" if they had taken place after transfer of the land to the

4    Timbisha Reservation two years later.  Accusing Ms. Esteves of being a felon is reckless and

5    damaging to the reputation of a revered Tribal Elder.  Ms. Esteves was the Chairperson of the Tribe

6    who worked tirelessly to obtain re-recognition of the Tribe by DOI in 1982 and convinced Congress

7    to set aside the Timbisha Reservation in 2000.  Finally, this incorrect characterization should not be

8    used to question the legitimacy of the legitimate Death Valley government in 2000 or 2007-09 when

9    Pauline Esteves was on the Death Valley Tribal Council.

10         178.    On the basis of Gholson's word, without any certification from the Tribal Election

11   Board, Burdick precipitously recognized Gholson as Tribal Chairman on October 17, 2008.  Soon

12   thereafter, Burdick attempted to derail the Tribe's General Election by purporting to recognize the

13   2006 Tribal Council in a letter dated the day before the election, but after most votes had been cast by

14   absentee ballot.  Burdick's letter was not made effective immediately, however, so it would not have

15   taken effect until December 10, 2008.

16         179.    Despite the lack of an exigent circumstance as defined by 25 CFR 2.6, on December 4,

17   2008, Morris decided to recognize Gholson on an *ex parte* basis and make the decision final for DOI,

18   despite the fact that two appeals from Burdick's decisions pertaining to Timbisha elections were then

19   pending before Morris.  Neither Morris nor Gholson's law firm supplied a copy of his *ex parte* filing

20   to the Death Valley Tribal Council for over a month after the Death Valley Tribal Council filed suit to

21   overturn Morris's December 4, 2008 decision in this Court.

22         180.    Burdick on October 20, 2008, and Morris on December 12, 2008, represented to an

23   Inyo County Deputy Sheriff that Gholson had the right to remove tribal property from the Tribal

24   Administration Building on the Reservation.  In both cases the decisions were premature, but even if

25   they had validly recognized Gholson, Burdick and Morris were both faced with three of five Tribal

26   Council members vociferously opposing the removal of tribal property by Gholson and the fact that

27   the Chairman, which Gholson claimed to be, does not have a vote on the Tribal Council.  Further, it is

28   beyond the authority of DOI bureaucrats to give authorization to a state law enforcement official to

     use the threat of force to carry out the wishes of even a legitimate tribal chairman.  Both Burdick and

1   Morris refused to assist the Death Valley Tribal Council to regain possession of the Tribe's

2   confidential files when they no longer recognized Gholson, much less offering the Tribal Council

3   assistance similar to that offered to Gholson.

4       181.    In the EHD I, the discussion of membership is personalized by referring to the "belief"

5   of "Mr. Kennedy" that the disenrollees are not eligible for membership.  Well before DOI could have

6   reasonably considered the conduct of the DOI Election on April 29, 2011, DOI had represented to the

7   U.S. Court of Appeals for the D.C. Circuit that the election was valid and treated Gholson's

8   certification as beyond reproach.

9       182.    For four years, DOI entertained the Beaman Appeal, permitting that Faction to respond

10  to every argument offered by the Death Valley Tribal Council in support of the Tribal General

11  Election conducted by the Tribal Election Board.  Rather than allow the Death Valley Tribal Council

12  to rebut Gholson's arguments in favor of his election, DOI issued EHD II, and made it final for the

13  agency.  Thus, EHD II denies to the Death Valley Tribal Council and the rest of the appellants who

14  stood ready to appeal if DOI recognized the DOI Election the opportunity to argue their views before

15  a federal agency – even one as predisposed against them as DOI.  Further, EHD II does not supply a

16  reasoned analysis supporting DOI's finding that there was no merit to the appeals of Plaintiffs and the

17  other 20% of voters who appealed the DOI Election, and thus violates the APA.

18      183.    Although DOI refused for four years, in defiance of federal common law and its own

19  rules, to defer to the certifications of the Tribal Election Board that had conducted all previous

20  recognized tribal elections, in EHD II, DOI suddenly declared that it was bound by the decision of an

21  entity created by Gholson for the DOI Election. The EHD did not supply a reasoned analysis for

22  dismissing the appellants objections to the DOI Election without any substantive consideration; for

23  DOI's sudden policy change from refusing to accept the certifications of the longstanding Tribal

24  Election Board to accepting without question the certification of an entity established by the Gholson

25  Faction; or for the basis of EHD II's recognition of the Gholson Faction.  Because it does not supply a

26  reasoned analysis or the facts on which EHD is based, it violates the APA.

27  ///

28  ///

**SIXTH CLAIM FOR RELIEF**

**Violation of the APA by Taking Actions Contrary to Law**

**(First and Fifth Amendments to the United States Constitution)**

184.   Plaintiffs hereby incorporate by reference paragraphs 1 through 183 of this Complaint as if each were set forth herein.

185.   On March 1, 2011, Echo Hawk ordered the removal of the longstanding and last validly elected Tribal Council.  It installed and forced on the Tribe the DOI-favored Gholson Faction – without any valid election or vote by the General Council of the Timbisha Tribe.  DOI had previously recognized and worked with the Kennedy Faction and its direct predecessors for three decades.

186.   To accomplish the installation of the Gholson Faction, DOI took two actions that lacked any rational basis or support in reasoning or precedent and were pretextual and meant to hide or disguise the import and purpose of DOI.

    a.   DOI invalidated the re-election of the Kennedy Faction in the November 2010 General Election.  DOI's stated reason was that the Kennedy Faction refused to allow anyone to vote who wanted to and, instead, applied the clear qualifications and followed the clear mandate of the Timbisha Constitution to apply and enforce the qualifications in elections.  DOI claimed this was an error by the Kennedy Faction that was fatal to the validity of the election, but never has explained the reasoning or basis for invalidating this election.  DOI did not find, nor could it, that the Kennedy Faction officers wrongfully interpreted or applied the Timbisha constitution.  The election was voided by DOI solely because the Kennedy Faction allowed only members of the Tribe to vote, without any further reason or explanation.  This was not only arbitrary, beyond the powers of DOI, and wrong; it was so baseless and irrational as to demonstrate or strongly imply an unstated motive or bias against the Kennedy Faction.

    b.   Once DOI invalidated elections conducted by both Factions, it decided it had to chose one of the Factions to conduct a new election.  DOI –not the Tribe in an election – chose the Gholson Faction to "temporarily" lead the Tribe, which DOI later characterized as "inexorably" leading to permanent control of the Tribe by the Gholson Faction.  The last valid election resulted in the membership selecting the Kennedy Faction, the last clearly valid and

1    longstanding officers of the Tribe.  DOI ignored this obvious basis for deciding which Faction

2    should conduct the new election.  Instead, DOI held that the proper way to decide this was to

3    compare the votes garnered by each Faction in invalid elections run by each of them.  DOI

4    presented this as a reasonable and objective way to compare the rival Factions' relative

5    strength of support among the members of the Tribe, and to resolve an impasse.  But it was

6    neither reasonable nor objective.  DOI, of course, knew the vote totals when it chose this

7    highly questionable way – based on votes in invalid elections – to measure support.  But, more

8    importantly, this was a conscious, knowing choice in favor of the Gholson Faction, since

9    allowing the non-members to vote allows and encourages over one-quarter more people to

10   vote.  The Faction that allows anyone to vote unsurprisingly got more votes; this shows

11   nothing about the Factions' relative support among the actual Tribal members.  This was so

12   baseless and irrational as to demonstrate or strongly imply an unstated motive or bias against

13   the Kennedy Faction.

14        187.    During the period when DOI recognized and worked with the Kennedy Faction, the

15   Timbisha Tribe, led by the Kennedy Faction, sued the DOI in the U.S. District Court for the District

16   of Columbia, alleging that the DOI and the U.S. government had wrongfully and discriminatorily

17   taken a fund of money belonging to the Tribe and held in trust by the government.  The case was

18   intensely fought by DOI.  Once DOI installed the Gholson Faction as the officers of the Tribe, DOI

19   moved to dismiss the action in the D.C. District on the ground that the plaintiffs no longer represented

20   the Tribe.  Recently, the United States Court of Appeals for the D.C. Circuit dismissed the action on

21   that ground.  *Timbisha Shoshone Tribe, et al. v. Salazar, Secretary of the Interior, et al.*, D.C. Cir.,

22   No.11-5049 (May 15, 2012).  DOI's baseless and unlawful actions challenged in the instant action

23   provided the basis for DOI to get out of what was a substantial and important challenge to DOI's and

24   the government's mishandling of and wrongful conduct regarding Indian lands and funds.

25        188.    As discussed above, plaintiffs in this action have spoken out for decades against

26   federal actions affecting their lands in and around Death Valley and Western Shoshone ancestral

27   homelands throughout the Great Basin. Their campaigns have resulted in international and domestic

28   attention critical of federal actions on their ancestral lands.  As a result of the work of plaintiffs and

     others, organs of the United Nations and of the Organization of American States have found that the

SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF                    46                    CASE NO. 2:11-CV-00995-MCE-DAD

1    United States has discriminated against the Western Shoshone and deprived them of the due process

2    of law.  Those international entities have requested repeatedly that the federal government cure that

3    discrimination, resulting in embarrassment to the federal government.  Plaintiffs have brought or

4    joined in multiple lawsuits against federal agencies seeking to regain ancestral homelands, prevent

5    mining on those homelands, and block storage of nuclear waste on those homelands.  Their activities

6    repeatedly have caused difficulties for the federal government in international forums and the press

7    and have interfered with federal development activities in the Great Basin.

8          189.    Based on the foregoing, and upon information and belief, DOI's removal of the

9    Kennedy Faction as the officers and leaders of the Timbisha Tribe, and DOI's replacement of them

10   with the Gholson Faction, was based on and motivated by bias, an intent to hide wrongdoing, and self

11   interest because of the Kennedy Faction's filing of lawsuits and complaints, testimony, and publicly

12   speaking out in criticism of DOI on issues vital to the Timbisha Tribe and all Indian tribes and

13   individuals.

14         190.    All of the conduct and activities of the Kennedy Faction that were the basis of DOI's

15   wrongful and illegal actions against them were fully protected by the First and Fifth Amendments to

16   the Constitution of the United States.

17         191.    DOI's discriminatory, retaliatory and punitive actions toward the Kennedy Faction and

18   the Timbisha Tribe violate their rights to free speech, petition, and due process of law protected by the

19   First and Fifth Amendments to the Constitution of the United States.

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray as follows that this Court award the following prospective injunctive and declaratory relief against the Federal Defendants pursuant to each and all of the above Claims for Relief by issuing an Order that:

(1)     Declares that the Echo Hawk Decisions violated the APA because they were made in a manner that was arbitrary, capricious, and otherwise not in accordance with law, violated the Plaintiffs' constitutional right to due process of law, exceeded DOI's statutory authorities, and failed to comply with procedures required by law, but Plaintiffs specifically do not request that the Court declare that one or the other tribal faction is the legitimately elected tribal government;

(2)     Remands the Echo Hawk Decisions to DOI for further proceedings consistent with federal law, but Plaintiffs do not request that the Court stay the effectiveness of the Echo Hawk Decisions pending the outcome of further judicial or administrative proceedings, that the Court enjoin DOI to recognize or cease to recognize any particular tribal faction for the purposes of government-to-government relations, or that the Court make any order that would have the effect of creating a hiatus in federal government recognition of a tribal government;

(4)     Declares that the Rollback Rule violates the APA as an administrative rule established in violation of the APA and enjoins DOI from further reliance on the Rollback Rule unless and until it promulgates the rule pursuant to the APA;

(3)     Awards Plaintiffs reasonable fees, expenses, costs, and disbursements, including attorney fees pursuant to the Equal Access to Justice Act; and

(4)     Grants Plaintiffs such further and additional relief as the Court deems just and proper.

Dated: May 29, 2012                          Respectfully submitted,


                                             By:   /s/ Jeffrey R. Keohane
                                                   Jeffrey R. Keohane
                                                   FORMAN & ASSOCIATES
                                                   Attorneys for Plaintiffs